PER CURIAM.
 

 Seibert appeals an order of the circuit court summarily denying his first postcon-viction motion to vacate his conviction of first-degree murder and sentence of death.
 
 See
 
 Fla. R.Crim. P. 3.851. He also petitions this Court for a writ of habeas corpus. The State cross-appeals the circuit court’s ruling requiring the disclosure of certain public records. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const. We affirm the denial of postconviction relief, deny the habeas corpus petition, and affirm the public records ruling.
 

 I. BACKGROUND
 

 The facts of the underlying crime are set forth fully in this Court’s opinion on direct appeal:
 

 The evidence presented at the trial of appellant Michael Seibert revealed the following. On March 16, 1998, Karolay Adrianza, an eighteen-year-old high school student, was picked up from her home by Danny Korkour Navarres at approximately 10 p.m. The Navarres and Adrianza families were friends, and according to the trial testimony of Adri-anza’s sister, Adrianza and Navarres had been dating. Adrianza’s sister also testified that Adrianza and Navarres had planned to go out in Miami Beach on the evening of March 16.
 

 On March 16, William “Ace” Green, who had lived with Michael Seibert for approximately three weeks, left Sei-bert’s apartment at 1136 Collins Avenue in Miami Beach at approximately 10:30 p.m. Green testified that Seibert was the only person in the apartment at the time he left. When he returned a few hours later, at about 12:30 a.m., Adrianza and Navarres were at the apartment with Seibert. Green recognized the two because he had seen them at the apartment several times in the prior week. Green testified that the three of them were using cocaine when he arrived at the apartment, and they each continued to use cocaine in equal amounts throughout the night. Green snorted one line of cocaine and estimated that the other three consumed all together more than an eight ball (three and a half grams) of cocaine throughout the night. Testimony at trial revealed that the cocaine was likely “cut,” or diluted, with Lidocaine.
 

 Green testified that he thought that Seibert was interested in Adrianza because of the way Seibert acted around her. He stated that there was some rivalry between Navarres and Seibert because both were flirting with Adrian-za, but he could not point to any specific examples to demonstrate this rivalry.
 

 At about 3 a.m., Navarres and Green left in Navarres’ car to get beer and cigarettes after Seibert asked Green to go and Navarres offered to drive. The errand took approximately five to ten minutes, and upon their return, Na-varres dropped Green off at the apartment building, explaining that he had another place to go and that he would return later. When Green returned to the apartment, Adrianza asked where Navarres was, and upon learning that he had left, began using the apartment phone continuously, apparently in an attempt to reach Navarres. Evidence at the trial revealed that Seibert’s phone was used to dial Navarres’ cell and home phones nearly 100 times between 3:09 a.m. and 5:48 a.m. A half hour later, Seibert asked Green to go downstairs in the apartment building and to call him if he saw Navarres return. Green went downstairs and looked around, and then returned to the apartment.
 

 
 *72
 
 At around 4 or 5 a.m., Seibert asked Green to leave to give him some time alone with Adrianza. Green left and went to a laundry where a friend of his worked, which was located behind the apartment building. Green proceeded to call Seibert at home and on his pager five or six times in an attempt to convince Seibert to let him return to the apartment. At some point, Green spoke with Seibert. Green testified that Sei-bert told him to relax and then indicated that he needed a few more minutes with Adrianza because he thought he had an opportunity to have intercourse with her.
 

 At 6:30 a.m., Marsha Hill, who lived below Seibert, heard a noise like someone was rolling on the floor in Seibert’s apartment. This noise lasted for about six to seven minutes. A minute or so later, Hill heard a female voice scream for help twice. Green left the laundry sometime between sunrise and 8:15 a.m. and went back to the apartment a few times. He testified that he would knock on the door and make calls from the payphone outside of the apartment building, but Seibert refused to let him in. Seibert’s next-door neighbor, Jeanette Sosa, testified that at around 7:15 a.m., she left her apartment for work and saw Green outside the door of Sei-bert’s apartment. Green asked her whether Seibert was home and told her that he had been knocking on Seibert’s door for some time.
 

 Arcelis Korkour, Navarres’ aunt, with whom he was living in March of 1998, testified that three calls were received at her house in the early morning of March 17, 1998. At 5 a.m., following the third call, she called the number from which she had received the calls, and her husband spoke with the person who answered the phone, whom he identified as an American male. Then a woman got on the phone, identifying herself as “Patricia,” but Korkour testified that her husband recognized the voice to be that of Adrianza. After her husband hung up the phone, he went to check on Na-varres. Korkour testified that his bedroom door was locked from the inside and that Navarres always locked it when he was home but would leave it open when he was out. She testified that Navarres did not open the door when her husband knocked.
 

 On Green’s final attempt to speak with Seibert and enter the apartment much later that morning, Seibert asked him to leave and buy cigarettes. When Green refused, Seibert began to act erratically and stated that Green looked crazy and that he did not want to open the door for Green. Seibert then told Green that he (Seibert) was crazy and was going to kill himself. After this conversation, at 10:55 a.m., Green called 911.
 

 At 11 a.m., Miami Beach Police Department (MBPD) Officer Douglas Bales and Sergeant Howard Zeifman were dispatched to Seibert’s apartment in response to the 911 call from Green. When the officers arrived, they spoke with Green, who was waiting on the sidewalk in front of the apartment building when the officers arrived. Green led them to the apartment that he shared with Seibert, which was on the second floor of the building. The officers knocked on Seibert’s door and, after realizing that someone was in the apartment, told Seibert that they had received a suicide call and that they had to see that he was all right. After four or five minutes of knocking on the door by the officers, Seibert opened the door approximately three or four inches so that the officers could only see Seibert’s torso but not his arms or his legs. Sei-
 
 *73
 
 bert told the officers that he was okay and that they could leave. He then shut the door. The officers decided to knock again because they had not fully seen Seibert. After another two to three minutes of the officers attempting to persuade Seibert to open the door, Sei-bert again opened the door. Sergeant Zeifman stuck his baton in the door so that Seibert could not shut it again, and the officers entered the apartment. The officers told Seibert to sit down on a bed in the studio apartment. Officer Bales testified that he wanted to ensure that Seibert was alone, so when he asked Seibert whether anyone else was in the apartment, he backed up, glancing around to ensure that there was no one else in the room. As he was backing up, he saw, to his right and through the bathroom door that was slightly open, a severed foot on the edge of the bathtub. He shouted to Sergeant Zeifman a signal indicating that there was a homicide, and Seibert ran out of the apartment. The officers were able to apprehend Sei-bert in the hallway and placed him under arrest.
 

 After Seibert was taken to the police station, he stated that he was not under the influence of drugs or alcohol. He also told Detective Michael Jaccarino that Navarres had nothing to do with the crime. He said at one point that there were other people in the apartment who had knocked him out and that he did not know what had happened. When he was told that he was under arrest for murder, Seibert said that he had messed up and then stated, according to Detective Jaccarino, “I guess I am going to prison.”
 

 Seibert v. State,
 
 923 So.2d 460, 463-65 (Fla.2006) (footnote omitted).
 

 On April 1, 1998, Seibert was charged with first-degree murder. He filed a motion to suppress, which was denied. Trial commenced on October 28, 2002, and Sei-bert was convicted as charged on November 21, 2002. During the penalty phase, which began on January 27, 2003, the State presented the following: a victim impact statement, certified copies of Sei-bert’s prior convictions, testimony regarding the facts underlying those convictions, and the testimony of Dr. Emma Lew regarding the suffering Adrianza endured before her death. Seibert, on the other hand, presented the following: the testimony of Sergeant Paul Acosta regarding Seibert’s appearance and statements after his arrest; the testimony of Green regarding Seibert’s use of drugs in the weeks before the murder; the testimony of Dr. Ronald Wright regarding Adrianza’s suffering; the testimony of Sergeant Arthur Clemons regarding Seibert’s behavior while in pretrial detention; the testimony of Myra Torres, a friend of Seibert’s, regarding Seibert’s state of mind in the weeks before the murder; the testimony of Dr. Bill Mosman, a psychologist, regarding Seibert’s family history and mental health; and the testimony of Dr. Brad Fisher, another psychologist, regarding Seibert’s potential for future dangerousness. In rebuttal, the State presented the testimony of Dr. Daniel Martell, a psychologist, regarding Seibert’s family history and mental health.
 

 The jury on February 11, 2003, rendered its advisory sentence, and the judge on March 24, 2003, followed the jury’s nine-to-three recommendation and sentenced Seibert to death based on two aggravating circumstances,
 
 [1]
 
 no statutory mitigating circumstances, and six non-stat
 
 *74
 
 utory mitigating circumstances.
 
 [2]
 
 Seibert appealed, raising six claims,
 
 [3]
 
 and this Court affirmed.
 
 Seibert v. State,
 
 923 So.2d 460 (Fla.2006). On September 11, 2007, Seibert filed a rule 3.851 motion, raising eleven claims.
 
 [4]
 
 The postconviction court on January 24, 2008, held a
 
 Huff
 
 hearing,
 
 [5]
 
 and on February 28, 2008, entered an order summarily denying the motion. On April 4, 2008, Seibert then filed the present appeal, raising five claims,
 
 [6]
 
 and the State filed a cross-appeal, raising one claim.
 
 [7]
 
 Seibert also filed the present habeas petition, raising seven claims.
 
 [8]
 

 
 *75
 
 II. RULE 3.851 PROCEEDING
 

 Claim 1
 

 In this claim, Seibert asserts that the postconvietion court erred in summarily denying his claim that trial counsel was ineffective with respect to the suppression hearing and the guilt phase of his trial. He asserts that he is entitled to an eviden-tiary hearing on this claim. We disagree. Because a court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003) (holding that “pure questions of law” that are discernible from the record “are subject to de novo review”). Accordingly, when reviewing a court’s summary denial of an initial rule 3.851 motion, the Court must accept the movant’s factual allegations as true, and the Court will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or that there is no issue of material fact to be determined.
 
 See Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852 & 3.993,
 
 772 So.2d 488, 491 n. 2 (Fla.2000)
 
 (Amendments
 
 I). However, to the extent there is any question as to whether a rule 3.851 movant has made a facially sufficient claim requiring a factual determination, the Court will presume that an evidentiary hearing is required.
 
 See id.
 

 When determining whether an evidentiary hearing is required on an initial rule 3.851 motion, a court cannot look beyond the filings. An evidentiary hearing must be held whenever the movant makes a facially sufficient claim that requires a factual determination.
 
 See Amendments I,
 
 772 So.2d at 491 n. 2 (endorsing the proposition that “an evidentiary hearing is mandated on initial motions which assert ... legally cognizable claims which allege an ultimate factual basis”).
 
 [9]
 
 On an initial rule 3.851 motion, to the extent there is any question as to whether the movant has made a facially sufficient claim requiring a factual determination, the court must presume that an evidentiary hearing is required.
 
 See Amendments I,
 
 772 So.2d at 492 n. 2 (stating that adoption of provision addressing evidentiary hearings is consistent with Court’s endorsement of a presumption in favor of evidentiary hearings on initial postconvietion motions raising factually based claims). In other words, a postconvietion claim may be summarily denied only when the claim is “legally insufficient, should have been brought on direct appeal, or [is] positively refuted by the record.”
 
 Connor v. State,
 
 979 So.2d 852, 868 (Fla.2007).
 

 In its order denying Seibert’s rule 3.851 motion, the postconvietion court ruled as follows with respect to this claim:
 

 Defendant alleges that counsel was ineffective for failing to present evidence and effectively argue that the police conducted an illegal search of Defendant’s apartment. As noted by Defendant, counsel filed a Motion to Suppress all Evidence on October 28, 2002. On October 31, 2002, a hearing was held on the Motion. Specifically, Defendant now contends that counsel was ineffective by failing to challenge Officer Bales’s improbable and far-fetched explanation. The trial court believed this improbable and far-fetched explanation and denied the Motion to Suppress. On appeal, the Florida Supreme Court agreed with the
 
 *76
 
 conclusions of the trial court. This issue was raised on appeal....
 

 As this issue was raised on direct appeal, it is procedurally barred.
 
 Rodriguez v. State,
 
 919 So.2d 1252, 1262 (Fla.2005).
 

 Defendant contends that trial counsel should have fíled a motion requesting a walk-through of the crime scene. Defendant strongly argued at the
 
 Huff
 
 Hearing that if a walk-through was done, the jurors would have determined that Officer Bales’ testimony was not truthful as there was a pocket door blocking his access to the bathroom. If there was a pocket door, it would have been visible in State’s Exhibit 3. It is not. This court viewed every photograph that was introduced into evidence at trial prior to preparing this order. Not a single photograph indicated that there was a pocket door. To the contrary, the photographs indicate that there was a hinged door, which is consistent with the testimony of Officer Bales.
 

 A blow up of the layout of the apartment was introduced into evidence as State’s Exhibit 48 during the trial on November 15, 2002. A picture is worth a thousand words. The layout clearly shows that the bathroom is in close proximity to the front door. All the officer had to do was enter the main room of small studio apartment, take a couple of small steps, and turn his head to see the bathroom.
 

 Also, Exhibit 3, a copy of which is attached hereto, shows the view of the small studio apartment from the bathroom. The front door is clearly visible and close to the bathroom. Exhibit 10, a copy of which is attached, clearly shows that the bathroom had a hinged door. There is no pocket door. While it may not appear as clear without the color, this court, when viewing the color photograph that was introduced into evidence, can clearly see the tile, where the tile ends, the caulking of the tub, and the side of the tub while looking through the space between the door and the wall, on the side where the door hinges to the wall. What the court can see in the Exhibit 10 is consistent with the testimony of Office Bales.
 

 Additionally, Crime Scene Investigator Marsha Knowles also testified about the layout of the apartment.
 

 Q: Now, does this apartment have more than one room?
 

 A. Yes.
 

 Q. Are there doors separating one room from another? Let me show you what has been marked as State’s Exhibit 32, can you tell us by looking at that photograph?
 

 A. From my recollection and from the photographs, I think there was only one interior door that led to the bathroom area.
 

 It is clear to this court that the photographs do not depict a pocket door. The testimony and the pictures refute that there is a pocket door. To the contrary, there is a hinged door.
 

 This claim is procedurally barred and refuted by the record. It is denied.
 

 Applying the above standard of review, Seibert has failed to show that the post-conviction court erred in summarily denying this claim.
 

 The legality of the apartment search was litigated extensively both prior to trial and on appeal. In his rule 3.851 motion, Seibert contended that trial counsel was ineffective in failing to make the following additional claims with respect to the search: (1) trial counsel should have pointed out that, based on the layout of the apartment and based on Officer Bales’s own testimony, Bales could not have
 
 *77
 
 viewed the interior of the bathroom without conducting an extensive search of the apartment; (2) trial counsel should have requested that the court conduct a “walk through” of the apartment to determine the extensive nature of Bales’s search; (3) trial counsel should have pointed out that Officer Bales’s testimony was suspect because none of the crime scene photos showed a severed foot on the edge of the bathtub; and (4) trial counsel should have pointed out the absurdity of Officer Bales’s statement that he was walking backward as he surveilled the interior of the apartment to see if anyone else was present. As noted above, the postconviction court rejected this claim as both procedurally barred and refuted by the record.
 

 To the extent the posteonviction court ruled that this claim was procedurally barred because the underlying issue had been raised at the suppression hearing and on appeal, this Court has already addressed this type of procedural bar and ruled contrary to the postconviction court:
 

 The trial court concluded that this claim was barred because it either was, or could have been, raised on direct appeal. This was error. Whereas the main question on direct appeal is whether the trial court erred, the main question in a
 
 Strickland
 
 claim is whether trial counsel was ineffective. Both claims may arise from the same underlying facts, but the claims themselves are distinct and — of necessity — have different remedies: A claim of trial court error generally can be raised on direct appeal but not in a rule 8.850 motion, and a claim of ineffectiveness generally can be raised in a rule 3.850 motion but not on direct appeal. A defendant thus has little choice: As a rule, he or she can only raise an ineffectiveness claim via a rule 3.850 motion, even if the same underlying facts also supported, or could have supported, a claim of error on direct appeal. Thus, the trial court erred in concluding that [this] claim was procedurally barred.
 

 Bruno v. State,
 
 807 So.2d 55, 63 (Fla.2001) (footnotes omitted). Nevertheless, it does not appear that the postconviction court erred in denying this claim.
 

 Officer Bales’s testimony was essentially consistent throughout the proceeding — at his deposition, at the suppression hearing, and during the trial — and was consistent with this Court’s statement of events:
 

 The officers then had Seibert sit on the bed in the studio apartment, and Sergeant Zeifman remained to Seibert’s right, in the kitchen area, while Bales stood four or five feet in front of him. The officers confirmed that Seibert was okay, and Bales glanced around the apartment, backing up a bit, to make sure no one else was in the apartment and that there were no objects around that indicated Seibert was attempting to commit suicide (e.g., pills, a rope, or knives). Bales asked Seibert whether there were other people in the apartment. As he asked this question, he lopked to his right and was able to see through the slightly open bathroom door the severed foot of the victim on the edge of the bathtub. It was estimated that Bales was about six feet from the bathroom when he was able to see the foot.
 

 Seibert,
 
 923 So.2d at 467-68.
 

 To the extent Seibert now claims that Officer Bales’s testimony is inconsistent with the layout of the apartment and that this fact would have been apparent if the court had conducted a “walk through” of the apartment, this claim is refuted by the record. As noted by the postconviction court, State’s Exhibit 3, which is a photographic view taken from the bathroom area, shows that there is a clear line of
 
 *78
 
 vision from the bathroom area to the front door of the apartment and to much of the living area, and State’s Exhibit 48, which is a representative drawing of the layout of the entire apartment, shows that all the distances within the studio apartment are of modest proportion and that there is an unobstructed view throughout most of the apartment. Also, crime scene investigator Marsha Knowles, who investigated this crime scene, testified that Exhibit 48 was drawn to scale, even though it was customary for such drawings to be labelled “not to scale.” These exhibits support Officer Bales’s testimony conclusively. To the extent Seibert now claims that a “pocket door” played a key role in the legality of the search, the only reference he made to such a door in his rule 3.851 motion was as follows: “On the west wall of the main living room, there is a doorway with a pocket door that leads to a hallway.” This statement, in context, in no way undermines the credibility of Officer Bales’s testimony, for none of the exhibits and none of the testimony of the witnesses indicates that such a door interfered in any way with the view into, or impeded the access to, the bathroom from the living area.
 

 To the extent Seibert now claims that none of the crime scene photos show a severed foot on the edge of the bathtub, although this statement is correct, the record reveals that the photos were taken several hours after Officer Bales observed the severed foot on the tub and that in the intervening period there had been extensive activity in the bathroom area, particularly in the immediate vicinity of both the tub and the victim’s body, which was in the tub. Further, the crime scene photos show a bloody area on the edge of the tub and a bloody smear on the wall of the tub, which is consistent with a severed foot having been placed on the edge of the tub and then having slid down the wall of the tub and lodged next to the body, where the foot was later found. And finally, to the extent Seibert now claims that trial counsel should have argued the absurdity of Officer Bales’s statement that he was walking backward as he surveilled the interior of the apartment, this claim involves no factual determination, and as a substantive matter, Seibert cites no authority to support this proposition.
 

 Claim 2
 

 In this claim, Seibert asserts that the posteonvietion court erred in denying his claim of ineffective assistance of counsel with respect to the penalty phase. We disagree. Because both prongs of the ineffectiveness test set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), present mixed questions of law and fact, this Court employs a mixed standard of review.
 
 Sochor v. State,
 
 883 So.2d 766, 771 (Fla.2004). The Court will defer to the postconviction court’s factual findings as long as they are supported by competent, substantial evidence in the record, and the Court will review the lower court’s legal conclusions de novo.
 
 Id.
 
 at 772.
 

 Following the United States Supreme Court decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that the Sixth Amendment right to counsel embodies the right to effective assistance of counsel), this Court held that two requirements must be met to satisfy the deficient performance and prejudice prongs
 
 [10]
 
 of
 
 Strickland:
 

 
 *79
 
 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted).
 

 Several additional criteria apply to such claims. First, there is a strong presumption that counsel’s performance was not ineffective.
 
 See Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052 (“Judicial scrutiny of counsel’s performance must be highly deferential.”). Second, “[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 Third, the defendant must “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 Specifically, “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone v. State, 768
 
 So.2d 1037, 1048 (Fla.2000).
 

 With respect to the admission of testimony concerning the prior violent felony aggravating circumstance, the Court has held as follows:
 

 “[A]ny relevant evidence as to a defendant’s character or the circumstances of the crime is admissible [during capital] sentencing [proceedings].”
 
 Stano v. State,
 
 473 So.2d 1282, 1286 (Fla.1985);
 
 see also
 
 § 921.141(1), Fla. Stat. (2005) (“In the [capital sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to the character of the defendant. ...”). In the penalty phase of a capital trial it is appropriate to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction.
 
 See Tompkins v. State,
 
 502 So.2d 415 (Fla.1986);
 
 Stano,
 
 473 So.2d at 1289. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.
 
 Rhodes v. State,
 
 547 So.2d 1201, 1204 (Fla.1989). Such testimony would also be relevant in determining what weight to give to the prior felony aggravator.
 

 Franklin v. State,
 
 965 So.2d 79, 96 (Fla.2007). Further, “[i]n such circumstances, hearsay testimony is admissible, provided the defendant has a fair opportunity to rebut it.”
 
 Hudson v. State,
 
 708 So.2d 256, 261 (Fla.1998).
 

 During the penalty phase, the State called Sergeant Hundevadt to testify about the facts of Seibert’s 1986 convictions for kidnapping and attempted first-degree murder.
 
 [11]
 
 Hundevadt testified
 
 *80
 
 that in 1986 he was a detective assigned to the kidnapping of a female British tourist. He told the jury that fifteen to twenty minutes after the victim was kidnapped, the victim and the defendant were seen by two school children at a bus stop, and that the defendant stopped to speak to one of the children. Hundevadt then related what one of the children, Andrea Henderson, told investigators:
 

 Q Was the statement taken from Andrea Henderson fifteen years back, in 1986?
 

 A Yes.
 

 Q Have you reviewed that statement?
 

 A Yes.
 

 Q Did Andrea Henderson say whether or not she had the opportunity to look inside the car?
 

 A Yes, she did.
 

 Q What did she see?
 

 A She saw the defendant and a nude white female in the front seat of the vehicle. The nude white female, her head was in the defendant’s lap.
 

 Q Did he have his hand on her?
 

 A Andrea testified that she was being held, the victim was being held against her will in a hold similar to what she described as being a head lock with her head in his lap.
 

 Q Was there anything about his clothes that she noticed?
 

 A Well, there came a point in that confrontation where he lifted the head down and said don’t say anything. Could you repeat the question?
 

 Q Is there anything Andrea Henderson noticed about his pants?
 

 A His pants were undone and penis exposed.
 

 Q Where was the face of the mouth of this British nurse?
 

 MR. WHITE: Objection, Your Honor.
 

 THE COURT: Overruled.
 

 THE WITNESS: She is in his lap.
 

 BY MS. SEFF:
 

 Q At some point did she have the opportunity to see the face of this young woman?
 

 A Yes, ma’am, she did.
 

 Q What was the woman doing?
 

 A She was crying, according to Andrea’s testimony.
 

 Sergeant Hundevadt then related additional details concerning Seibert’s prior convictions for kidnapping and attempted first-degree murder.
 

 In its order denying Seibert’s rule 3.851 motion, the postconviction court ruled as follows with respect to this claim:
 

 Defendant alleges that counsel was ineffective for failing to object to the hearsay statement of Andrea Henderson. Counsel did file a Motion in Limine and a hearing was held on the
 
 *81
 
 issue. During the penalty phase, Sergeant Robert Hundevadt of the Miami Beach Police Department was called to testify about the facts of the Defendant’s 1986 convictions of kidnapping and attempted murder in the first degree. He testified about Andrea Henderson’s statements to investigators.
 

 Defendant also contends that trial counsel was ineffective for stipulating that the hearsay statements of Leon Golden and Michelle Kendricks be read to the jury.
 

 Counsel contends that the statements interfered with the Defendant’s right to confrontation and were not admissible pursuant to
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 
 Crawford
 
 was decided after the completion of the penalty phase. Counsel cannot be deemed ineffective for failing to anticipate changes in the law.
 
 Peede v. State,
 
 955 So.2d 480, 502-030 (Fla.2007).
 

 [[Image here]]
 

 This claim is denied.
 

 Applying the above standard of review, Seibert has failed to show that the post-conviction court erred in denying this claim.
 

 The court’s factual statements are supported by competent, substantial evidence and the court properly applied the law. In his rule 3.851 motion, Seibert claimed that trial counsel was ineffective in failing to object to out-of-court statements made by the victims of Seibert’s prior crimes. In particular, he referred to Sergeant Hunde-vadt’s testimony regarding Andrea Henderson’s statements and the prosecutor’s reading of Leon Golden’s and Michelle Kendricks’s statements to police. Seibert claimed that counsel should have objected to admission of the statements on the basis that the statements were hearsay and that Seibert had no opportunity to rebut them and that this constituted a Confrontation Clause violation. Had counsel objected on these grounds, Seibert contends, the jury might not have heard the prejudicial testimony, and the issue would have been preserved for appeal and may have provided a basis for relief under
 
 Crawford v. Washington,
 
 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that testimonial evidence is admissible only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant), which was decided in the interim between imposition of Seibert’s sentence and the filing of his brief on direct appeal.
 

 First, as for Seibert’s claim that counsel failed to object to the admission of Andrea Henderson’s statement based on hearsay and Confrontation Clause grounds, Seibert is incorrect. Prior to the penalty phase, defense counsel filed a motion in limine seeking to exclude “[t]he hearsay testimony re Involuntary Sexual Battery including but not limited to any hearsay testimony which the defendant cannot rebut.” Counsel pointed out that admission of such evidence is barred when the evidence “is not relevant, gives rise to violations of the defendant’s confrontation rights, or the prejudicial value outweighs the probative value.” Counsel further explained that should the jury hear the evidence “they would be inflamed and prejudiced to the extent that the defendant could not receive a fair and impartial penalty phase as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 22 of the Florida Constitution.” The trial court denied the motion.
 

 Second, to the extent Seibert argues that trial counsel’s failure to renew the pre-penalty phase objection at trial had the effect of waiving the issue for
 
 *82
 
 appellate review
 
 [12]
 
 and this deprived Seibert of an opportunity to seek relief under the not-yet-decided Crawford decision, it is well-settled that trial counsel cannot be deemed ineffective for failing to anticipate a change in the law.
 
 See Peede v. State,
 
 955 So.2d 480, 502-03 (Fla.2007) (“[Counsel cannot be deemed ineffective for failing to raise a meritless claim or to anticipate a change in the law.”). And third, pursuant to this Court’s case law, defense counsel’s stipulation as to the prosecutor’s reading of the statements of Leon Golden and Michelle Kendricks does not constitute deficient performance.
 
 See Rodriguez v. State,
 
 753 So.2d 29, 44 (Fla.2000) (“In the case of prior violent felony convictions, because those details are admissible, it is generally beneficial to the defendant for the jury to hear about those details from a neutral law enforcement official rather than from prior witnesses or victims.”).
 

 Claim 3
 

 In this claim, Seibert alleges that the postconviction court erred in summarily denying his claim that Florida’s lethal injection procedure is unconstitutional in light of the botched execution of Angel Diaz. We disagree. In its order denying Seibert’s rule 3.851 motion, the postconviction court ruled as follows with respect to this claim:
 

 Defendant alleges that based on the execution of Angel Diaz, the method of execution is unconstitutional. Subsequent to the Diaz execution, an eviden-tiary hearing was held in the case of Ian Decco Lightbourne. The trial court found that the procedure utilized by the State of Florida is constitutional. The Florida Supreme Court also rejected the claim that the procedure is unconstitutional.
 
 Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007).
 

 Seibert has failed to show that the post-conviction court erred in summarily denying this claim, for this issue has already been decided adversely to him.
 
 See Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007).
 

 Claim U
 

 In this claim, Seibert asserts that the postconviction court erred in denying his claim that he was denied access to public records under Florida Rule of Criminal Procedure 3.852. We disagree. The standard of review for public records claims is as follows:
 

 The trial court’s determination of whether certain documents are exempt from production is subject to an abuse of discretion standard.
 
 Johnson v. State,
 
 904 So.2d 400, 405 (Fla.2005) (citing
 
 Mills v. State,
 
 786 So.2d 547, 552 (Fla.2001)). “Discretion is abused only when the trial court’s decision is ‘arbitrary, fanciful, or unreasonable.’ ”
 
 Johnson,
 
 904 So.2d at 405 (quoting
 
 White v. State,
 
 817 So.2d 799, 806 (Fla.2002)).
 

 Gonzalez v. State,
 
 990 So.2d 1017, 1033 (Fla.2008).
 

 In its order denying Seibert’s rule 3.851 motion, the postconviction court ruled as follows with respect to this claim:
 

 Defendant contends that he was denied access to public records from the DOC that he was entitled to. In September 2007, this court entered an order on Defendant’s entitlement to records. The Defendant has not filed any motions alleging that he has not received the
 
 *83
 
 records from DOC, this court concludes that DOC complied with the order.
 

 Additionally, this court did conduct an in camera inspection of the sealed records. An order was entered following the inspection of the sealed records indicating that the records were properly sealed.
 

 Defendant also contends that Fla. R.Crim. P. 3.852 is unconstitutional. This claim has been rejected by the Florida Supreme Court.
 
 In re Amendment to Fla. R.Crim. P.—Capital
 
 Post-
 
 conviction Public Records Production,
 
 683 So.2d 475, 475-76 (Fla.1996).
 

 Applying the aboye standard of review, Seibert has failed to show that the post-conviction court erred in denying this claim.
 

 In his rule 3.851 motion, Seibert made three allegations: (1) the postconviction court had not entered an order pursuant to the June 22, 2007, public records hearing; (2) the postconviction court had not held a hearing or entered an order with respect to certain sealed records; and (3) rule 3.852 is unconstitutional. The present record, however, shows the following: (1) the court on September 12, 2007, entered an order pursuant to the June 22, 2007, hearing; (2) the court conducted an
 
 in camera
 
 review of the sealed records and on September 20, 2007, entered an order with respect to those records; and (3) the court rejected the claim that rule 3.852 is unconstitutional. Seibert now claims that on March 6, 2008, after the postconviction court issued its February 28, 2008, order denying his rule 3.851 motion, he filed both a motion for rehearing and a motion to compel disclosure of the public records that were the subject of the court’s September 12, 2007, order. He contends that the court never ruled on the motion to compel, and that he now is entitled to a ruling on the motion and is entitled to the requested public records. As pointed out by the State, however, when Seibert on April 4, 2008, filed his present appeal, he abandoned the pending motion to compel and waived that issue for appellate purposes.
 
 See Richardson v. State,
 
 437 So.2d 1091, 1094 (Fla.1983) (“We note also that appellant did not pursue his motion to strike even though the judge did not rule on the motion. Under these circumstances, appellant has not preserved the issue for appeal.”). Further, with respect to the particular claim raised in the motion to compel, Seibert raised the same claim in his motion for rehearing, and the postcon-viction court’s denial of that motion operated as a denial of the claim.
 

 Claim 5
 

 With respect to the various claims contained in this fifth claim, Seibert has failed to show that the postconviction court erred. First, with respect to Seibert’s claim that the postconviction court erred in denying his claim that trial counsel was ineffective in protecting his right to be present at all the critical stages of his trial, this claim lacks merit — Seibert also raises this claim as a claim of ineffective assistance of appellate counsel in his present habeas petition and the claim is addressed in more detail below. Second, with respect to Seibert’s claim that the postcon-viction court erred in denying his claim that he is exempt from execution because he is mentally ill, this issue has already been decided adversely to Seibert.
 
 See Diaz v. State,
 
 945 So.2d 1136, 1151 (Fla. 2006) (“[Njeither this Court nor the Supreme Court has recognized mental illness as a per se bar to execution.”). Third, with respect to Seibert’s claim that the postconviction court erred in denying his claim that the report of the American Bar Association entitled
 
 Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty As
 
 
 *84
 

 sessment Report
 
 (the ABA Report), published September 17, 2006, shows that the death penalty is unconstitutional in Florida, this issue has already been decided adversely to Seibert.
 
 See Rolling v. State,
 
 944 So.2d 176, 181 (Fla.2006) (“[Nothing in the report would cause this Court to recede from its past decisions upholding the facial constitutionality of the death penalty.”).
 

 Fourth, with respect to Seibert’s claim that the postconviction court erred in denying his claim that the one-year time limit in rule 3.851 is unconstitutional, this issue has already been decided adversely to Seibert.
 
 See Vining v. State,
 
 827 So.2d 201, 215 (Fla.2002) (“This Court has repeatedly rejected arguments that the one-year time limit imposed by Florida Rule of Criminal Procedure 3.851 is unconstitutional.”). Fifth, with respect to Seibert’s claim that the postconviction court erred in denying his claim that rule 4-3.5(d)(4), Rules Regulating the Florida Bar, which restricts a lawyer’s ability to initiate communication with jurors after dismissal of the jury, is unconstitutional, this issue has already been decided adversely to Seibert.
 
 See Israel v. State,
 
 985 So.2d 510, 522 (Fla.2008) (“[Tjhis Court has consistently rejected constitutional challenges to rule 4-3.5(d)(4).”). And sixth, with respect to Seibert’s claim that the postconviction court erred in denying his claim that he is entitled to relief based on cumulative error, this issue has already been decided adversely to Seibert.
 
 See Griffin v. State,
 
 866 So.2d 1, 22 (Fla.2003) (“Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit.”).
 

 III. STATE’S CROSS-APPEAL
 

 In this claim, the State asserts that the postconviction court erred in requiring the State to produce certain records with respect to the State’s lethal injection protocols. We disagree. The standard of review for public records claims has been addressed by the Court as follows:
 

 The trial court’s determination of whether certain documents are exempt from production is subject to an abuse of discretion standard.
 
 Johnson v. State,
 
 904 So.2d 400, 405 (Fla.2005) (citing
 
 Mills v. State,
 
 786 So.2d 547, 552 (Fla.2001)). “Discretion is abused only when the trial court’s decision is ‘arbitrary, fanciful, or unreasonable.’ ”
 
 Johnson,
 
 904 So.2d at 405 (quoting
 
 White v. State,
 
 817 So.2d 799, 806 (Fla.2002)).
 

 Gonzalez v. State,
 
 990 So.2d 1017, 1033 (Fla.2008). In the present case, the post-conviction court’s order of September 12, 2007, provides as follows, in relevant part: “The Department of Corrections, the Office of the Attorney General and the Office of the Governor shall copy, index and deliver any public records considered during the adoption of the 2006 and 2007 lethal injection protocols that indicate that the protocols are flawed.” Applying the above standard of review, the State has failed to show that the postconviction court’s ruling is arbitrary, fanciful, or unreasonable.
 

 IV. HABEAS CORPUS PETITION
 

 Claim 1
 

 In this claim, Seibert asserts that his absence from critical stages of the pretrial proceedings constituted fundamental error and that appellate counsel was ineffective in failing to raise this issue on direct appeal. We disagree. First, claims of ineffective assistance of appellate counsel are properly presented in a petition for writ of habeas corpus.
 
 Freeman v. State,
 
 761 So.2d 1055, 1069 (Fla.2000). Consistent with the standard for ineffectiveness of trial counsel set forth in
 
 Strickland, v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052,
 
 *85
 
 80 L.Ed.2d 674 (1984), the standard for ineffectiveness of appellate counsel has two prongs. A court must determine the following:
 

 first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
 

 Pope v. Wainwright,
 
 496 So.2d 798, 800 (Fla.1986);
 
 see also Freeman,
 
 761 So.2d at 1069;
 
 Thompson v. State,
 
 759 So.2d 650, 660 (Fla.2000). In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.”
 
 Freeman,
 
 761 So.2d at 1069;
 
 see also Knight v. State,
 
 394 So.2d 997, 1001 (Fla.1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion.
 
 See Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000). “If a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.”
 
 Id.
 
 (quoting
 
 Williamson v. Dugger,
 
 651 So.2d 84, 86 (Fla. 1994)).
 

 And second, this Court has held as follows with respect to a defendant’s right to be present at the crucial stages of a trial:
 

 A defendant has a constitutional right to be present at all “crucial stages of his trial where his absence might frustrate the fairness of the proceedings.”
 
 Garcia v. State,
 
 492 So.2d 360 (Fla.1986). However, the right “does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed.”
 
 United States v. Vasquez,
 
 732 F.2d 846, 848 (11th Cir. 1984);
 
 see also Rutherford v. Moore,
 
 774 So.2d 637 (Fla.2000);
 
 Cole v. State,
 
 701 So.2d 845 (Fla.1997) (finding that the constitutional right to be present does not extend to conferences involving purely legal matters because the defendant’s presence would be of no assistance to counsel).
 

 Orme v. State,
 
 896 So.2d 725, 738 (Fla. 2005).
 

 Applying the above law to the present case, we conclude that Seibert is not entitled to relief. The hearings of May 7, 1998, July 20, 1998, January 16, 2001, February 28, 2001, October 12, 2001, March 26, 2002, and October 10, 2002, concerned legal issues and scheduling matters. Seibert could have provided no useful input. At the October 3, 2002, hearing, the trial court granted an
 
 ex parte
 
 motion for Seibert without hearing any argument, heard legal argument on a motion for continuance, and discussed scheduling matters; and at the June 4, 1999, hearing, the trial court heard legal argument as to whether a defendant was entitled to present motions
 
 ex parte
 
 regarding cost issues. These were legal issues on which Seibert could have provided no useful input. The same applies to the June 14,1999, hearing, where counsel sought appointment of a mitigation specialist in addition to the two mental health experts and two investigators that had already been appointed. The hearing was held
 
 ex parte,
 
 and the trial court appointed the mitigation specialist that defense counsel requested.
 

 
 *86
 
 The claim regarding the series of hearings (October 27, 2000; November 6, 2000; November 16, 2000; November 22, 2000; and January 19, 2001) about Seibert’s correspondence is equally without merit. At the first hearing, the trial court considered legal argument as to whether a special master should be appointed to conduct an
 
 in camera
 
 review to which the parties had agreed. At the next hearing, defense counsel acknowledged that there was no legal basis for the appointment of a special master, and the trial court and parties discussed the manner in which the letters would be submitted for the
 
 in camera
 
 review. At the next hearing, defense counsel submitted the materials for the
 
 in camera
 
 review in the manner that the court had directed. At the next hearing, the court announced that it had reviewed the letters, listened to legal argument about whether they were subject to disclosure, discussed the filing of written pleadings on the issue, heard a motion for continuance of trial, and discussed scheduling issues. At the January 19, 2001, hearing, the court indicated that it would announce its ruling that the letters had to be disclosed to Seibert personally. The court then addressed the scheduling of a deposition in Ecuador and the mechanism through which the letters would be disclosed. All these matters concerned legal issues.
 

 At the May 29, 2001, hearing, the court set a trial date and listened to concerns about the attorneys travelling to Atlanta to conduct a deposition because the county was refusing to pay for the witness to travel to Miami. Again, Seibert could have provided no useful input. While Sei-bert notes that Adrianza’s father spoke to the trial court at the April 26, 2001, hearing, the record shows that Mr. Adrianza merely expressed his frustration about the length of time that this matter had been pending. The trial court then explained to Mr. Adrianza the reasons for the delays and listened to the attorneys’ complaints about the delays in the proceeding. Again, Seibert could have provided no useful input. In sum, this claim lacks merit and appellate counsel cannot be deemed ineffective in failing to raise a meritless claim.
 
 See Groover v. Singletary,
 
 656 So.2d 424, 425 (Fla.1995) (“Appellate counsel’s failure to raise nonmeritorious issues does not constitute ineffective assistance.”).
 

 Claim 2
 

 In this claim, Seibert asserts that rule 4-3.5(d)(4), Rules Regulating the Florida Bar, which restricts a lawyer’s ability to initiate communication with jurors after dismissal of the jury, is unconstitutional and that appellate counsel was ineffective in failing to argue this issue on direct appeal. We disagree. The underlying issue was not preserved for review, and appellate counsel cannot be deemed ineffective for failing to raise it.
 
 See Medina v. Dugger,
 
 586 So.2d 817, 818 (Fla.1991) (“Appellate counsel is not ineffective for
 
 failing to
 
 raise issues
 
 not
 
 preserved for appeal.”). On the merits, the underlying issue has already been decided adversely to Seibert.
 
 See Israel v. State,
 
 985 So.2d 510, 522 (Fla.2008) (“[T]his Court has consistently rejected constitutional challenges to rule 4-3.5(d)(4).”). Appellate counsel cannot be deemed ineffective in failing to raise a meritless claim.
 
 Groover,
 
 656 So.2d at 425.
 

 Claim 3
 

 In this claim, Seibert asserts that the jury was biased and should have been discharged and a mistrial declared, and appellate counsel was ineffective in failing to raise this issue on direct appeal. We disagree. The Court has addressed the issue of juror misconduct and a court’s power to discharge the jury and declare a mistrial:
 

 
 *87
 
 “It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity.”
 
 Thomas v. State,
 
 748 So.2d 970, 980 (Fla.1999) (citing
 
 Salvatore v. State,
 
 366 So.2d 745, 750 (Fla.1978)). Moreover, addressing allegations of juror misconduct is left to the sound discretion of the trial judge.
 
 Doyle v. State,
 
 460 So.2d 358, 357 (Fla.1984).
 

 England v. State,
 
 940 So.2d 389, 402 (Fla.2006). Specifically, with respect to a motion for mistrial, the Court has noted:
 

 A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.
 
 Snipes v. State,
 
 733 So.2d 1000, 1005 (Fla.1999). A trial court’s ruling on a motion for mistrial is subject to an abuse of discretion standard of review.
 
 Perez v. State,
 
 919 So.2d 347 (Fla.2005),
 
 cert. denied,
 
 547 U.S. 1182, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006).
 

 England,
 
 940 So.2d at 401-02.
 

 The present record shows that on the third day of the penalty phase proceeding, alternate juror Levine told the court that some of the jurors had made homophobic comments about the clerk, and Levine asked to be excused. The trial court told the parties of the incident and solicited questions to be asked during juror interviews. During his interview, Levine stated that he was standing between jurors Glinton and Lennen waiting to enter the courtroom when Glinton started to speak about the court clerk in homophobic terms. Levine did not recall any specific response from Lennen but believed he had agreed with Glinton. Levine heard no reference to any party or attorney. He stated that the entire conversation lasted less than a minute. The trial court then interviewed all the jurors. Alternate juror Brookins stated that she had heard Glin-ton say to Lennen that the clerk was “queer.” Juror Rocawich testified that she heard Glinton use the word “gay” in a manner that made her uncomfortable but that she did not necessarily consider derogatory. Lennen stated that he and Glin-ton had been speaking about some people being married and also being homosexual before coming into the courtroom that morning. Glinton admitted that he and Lennen had been using language that pertained to homosexuals. Juror Pimienta had heard Glinton make a joking comment to Lennen about the clerk and homosexuality. Alternate juror Singh had vaguely heard someone use the word “queer” but did not know who had used the word. Juror Rexach similarly heard only the one vague reference to homosexuality. The other jurors did not hear the comment and never heard any other biased comment. After the interviews were completed, defense counsel moved for a mistrial. The trial court stated that it was excusing jurors Glinton and Lennen, but that a mistrial was unnecessary because the comment, while inappropriate, concerned the clerk and not Seibert or the lawyers. The trial court then asked if either party wished to have Levine excused because of his expression of discomfort. Defense counsel assented, and the court excused Levine.
 

 Applying the above law to the present case, we conclude that Seibert is not entitled to relief. The court learned of Glin-ton’s inappropriate statement and determined that it was sufficient to require juror interviews. During those interviews, all the jurors and alternates testified that no inappropriate comment was made that referred to Seibert, the attorneys, or the merits of the case. Under these circumstances, the trial court reasonably determined that the prejudice was limited to
 
 *88
 
 Levine, Glinton and Lennen and appropriately limited the remedy to the excusal of those jurors. Because the court did not abuse its discretion in resolving this incident, this claim is meritless. Accordingly, appellate counsel cannot be deemed ineffective in failing to raise it.
 
 Groover,
 
 656 So.2d at 425.
 

 Claim 4
 

 In this claim, Seibert asserts that the trial court erred in admitting gruesome photos of the victim and that appellate counsel was ineffective in failing to raise this issue on direct appeal. We disagree. The Court has addressed the issue of the admissibility of gruesome photographs and ruled as follows:
 

 This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance.
 
 See Bush v. State,
 
 461 So.2d 936, 939-40 (Fla.1984),
 
 cert. denied,
 
 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986);
 
 Williams v. State,
 
 228 So.2d 377, 378 (Fla.1969). Where photographs are relevant, “then the trial judge in the first [instance] and this Court on appeal must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unimpassioned consideration of the evidence.”
 
 Leach v. State,
 
 132 So.2d 329, 331-32 (Fla.1961),
 
 cert. denied,
 
 368 U.S. 1005, 82 S.Ct. 636, 7 L.Ed.2d 543 (1962).
 

 Czubak v. State,
 
 570 So.2d 925, 928 (Fla.1990). Moreover, ‘“[t]o be relevant, a photo of a deceased victim must be probative of an issue that is in dispute.’
 
 Almeida v. State,
 
 748 So.2d 922, 929 (Fla.1999).”
 
 Looney v. State,
 
 803 So.2d 656, 670 (Fla.2001). And finally, the admission of photographic evidence is within the sound discretion of the court, and a court’s ruling will not be disturbed on appeal absent a clear showing of abuse.
 
 Arbelaez v. State,
 
 898 So.2d 25, 44 (Fla.2005).
 

 Applying the above law to the present case, we conclude that Seibert is not entitled to relief. At trial, Seibert claimed as his defense in both opening and closing arguments that he had consensual sex with Adrianza, and that Danny Navarres or someone else who knew Adrianza had then entered the apartment and killed her out of rage. As part of its rebuttal, the State asserted that Adrianza’s body was being dismembered in a manner that left no evidence except in the bathtub and that this indicated that someone who lived in the apartment was responsible. The State pointed out that Adrianza’s panties showed that they had been cut by stabbing into them but that it was not possible to confirm whether she was alive at the time because the flesh around that area had been removed. The State noted that blood on Seibert’s jeans was consistent with having been spattered there during the dismemberment. By presenting this defense, Seibert made evidence of the dismemberment and its effects on the remaining evidence relevant to an issue in dispute. In fact, the trial court allowed the main dismemberment photo to be admitted into evidence because it was relevant for the following purposes: to show premeditation based on the possibility that some of the injuries were premortem, not postmortem; to show consciousness of guilt based on the perpetrator’s attempt to dispose of the body in a tidy fashion; to show the sequence of events based on blood spatter patterns; and to show the details of the crime scene, including the appearance and position of the severed foot. At the time that the trial court made its ruling, Seibert conceded that consciousness of guilt was a proper basis for admission of the photograph. Therefore, the lower court did not
 
 *89
 
 abuse its discretion in admitting the main dismemberment photo.
 

 At the time of trial, Seibert agreed that all but four of the photographs were admissible. With regard to the four photos, those photographs were used to show injuries Adrianza sustained before her death from being hit and from struggling with her killer and to explain how the medical examiner could tell the difference between premortem injuries and postmortem injuries when a body part was intact. During her testimony, Dr. Lew used these photographs to explain her testimony concerning how the injuries reflect that Adri-anza struggled with her killer while he was strangling and beating her and how the evidence concerning a ligature found around the victim’s neck indicated that the killer had made sure that Adrianza was dead. While Seibert admitted that Adri-anza was strangled, he contested both that he was the killer and that the killing was premeditated. Further, Seibert presented Dr. Wright during the penalty phase to contest HAC by asserting that Adrianza’s injuries did not show consciousness. Part of the State’s evidence regarding these issues was the testimony of Marsha Hill, Seibert’s downstairs neighbor, who heard six to seven minutes of banging coming from Seibert’s apartment at about 6:30 a.m., a time when Seibert was locked in the apartment with Adrianza, followed by screams for help. Photos showing that Adrianza sustained injuries consistent with a struggle corroborated this testimony. The trial court did not abuse its discretion in admitting the photographs. Appellate counsel was not ineffective in failing to raise this meritless issue.
 
 Groover,
 
 656 So.2d at 425.
 

 Claim 5
 

 In this claim, Seibert asserts that, although the trial court gave the standard HAC instruction, appellate counsel was ineffective in failing to argue that the court should have given the requested HAC instruction, which contained an intent element. The underlying issue in this claim, however, has already been decided adversely to Seibert.
 
 See Hoskins v. State,
 
 965 So.2d 1, 15-16 (Fla.2007) (noting that “HAC does not have an intent element,” and upholding the giving of the standard instruction with a minor modification). Appellate counsel cannot be deemed ineffective in failing to raise this meritless claim.
 
 Groover,
 
 656 So.2d at 425.
 

 Claim 6
 

 In this claim, Seibert asserts that appellate counsel was ineffective in failing to raise certain claims based on the ABA Report. The underlying issue in this claim, however, has already been decided adversely to Seibert.
 
 See Rolling v. State,
 
 944 So.2d 176, 181 (Fla.2006) (“[N]othing in the report would cause this Court to recede from its past decisions upholding the facial constitutionality of the death penalty.”). Appellate counsel cannot be deemed ineffective in failing to raise this meritless claim.
 
 Groover,
 
 656 So.2d at 425.
 

 Claim 7
 

 In this claim, Seibert asserts that due to appellate counsel’s collective failures, Seibert is entitled to a new appeal. This issue, however, has already been decided adversely to Seibert.
 
 See Chavez v. State,
 
 12 So.3d 199, 214 (Fla.2009) (“This Court has held that ‘where individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail.’
 
 Griffin v. State,
 
 866 So.2d 1, 22 (Fla.2003).”).
 

 V. CONCLUSION
 

 Based on the foregoing, we affirm the postconviction court’s order summarily denying Seibert’s first rule 3.851 motion.
 
 *90
 
 We deny his habeas corpus petition. And we affirm the postconviction court’s public records ruling.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . The court found that the following aggravating circumstances had been established, with the following weights: (1) Seibert was convicted of a prior violent felony (great weight); and (2) the crime was especially heinous, atrocious, or cruel (HAC) (great weight).
 

 [2]
 

 . The court found that the following non-statutory mitigating circumstances had been established, with the following weights: (1) Seibert was a nonviolent prisoner and posed no threat of harm to prison staff (moderate weight); (2) he had a dysfunctional family background and was adopted (little weight); (3) he had a history of psychological problems (moderate weight); (4) he had a history of drug abuse (little weight); (5) he was a good friend (minimal weight); and (6) his behavior in court was appropriate (minimal weight).
 

 [3]
 

 . Seibert raised the following claims on direct appeal: (1) the trial court erred in denying his motion to suppress the evidence seized at his apartment and his resulting statements; (2) the trial court erred in denying his motion for a mistrial after the State attempted to introduce evidence of his collateral criminal activity; (3) the trial court erred in denying his motion for mistrial after the State asked questions of a police detective that bolstered the credibility of another suspect's alibi; (4) the death sentence is disproportionate; (5) the trial court erred in denying a mistrial following a prosecutorial comment concerning an irrelevant criminal activity; and (6) Florida’s capital sentencing scheme violates
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 
 Seibert v. State,
 
 923 So.2d 460, 466 n. 4 (Fla.2006).
 

 [4]
 

 . Seibert raised the following claims in his rule 3.851 motion: (1) he was denied access to public records; (2) his rights were violated by application of rule 3.851 to him; (3) the rule prohibiting lawyers from interviewing jurors violates his rights; (4) juror misconduct; (5) he was absent from critical stages of his trial; (6) trial counsel was ineffective both pretrial and during the guilt phase; (7) he was denied an adversarial testing in the penalty phase; (8) newly discovered evidence; (9) lethal injection is unconstitutional; (10) he is mentally ill and cannot be executed; and (11) his trial was fraught with error.
 

 [5]
 

 .
 
 Huff
 
 v.
 
 State,
 
 622 So.2d 982 (Fla. 1993).
 

 [6]
 

 . Seibert raises the following issues in his present appeal; (1) whether the postconviction court erred in denying an evidentiary hearing on Seibert's ineffective assistance of counsel claim with respect to the suppression hearing and the guilt phase; (2) whether the postconviction court erred in denying Sei-bert’s ineffective assistance of counsel claim with respect to the penalty phase; (3) whether the postconviction court erred in denying an evidentiary hearing on Seibert’s lethal injection claim; (4) whether the postconviction court erred in denying Seibert’s claim that he was denied access to public records; and (5) whether the postconviction court erred in summarily denying the remainder of Seibert’s claims.
 

 [7]
 

 . The State raises the following issue on cross-appeal: Whether the postconviction court erred in requiring the State to produce certain records concerning its lethal injection protocols.
 

 [8]
 

 . Seibert raises the following issues in his habeas petition: (1) whether appellate counsel was ineffective with respect to Seibert’s absence from critical stages of his trial; (2) whether appellate counsel was ineffective with respect to the ethical rule barring lawyers from contacting jurors; (3) whether appellate counsel was ineffective with respect to juror misconduct; (4) whether appellate counsel was ineffective with respect to gruesome victim photos; (5) whether appellate counsel was ineffective with respect to the rejection of the special HAC instruction; (6) whether appellate counsel was ineffective with respect to the claim that the death penalty is arbitrary and capricious; and (7) whether appellate counsel was ineffective in that appellate counsel’s performance was deficient.
 

 [9]
 

 .
 
 See also
 
 Fla. R.Crim. P. 3.851(f)(5)(A)(i) (providing that, on initial motions, an eviden-tiary hearing is required “on claims listed by the defendant as requiring a factual determination”).
 

 [10]
 

 .
 
 See Strickland v. Washington,
 
 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (explaining that the two components of an ineffectiveness claim are deficient performance and prejudice to the defense).
 

 [11]
 

 . The present claim concerns the prior violent felony aggravating circumstance. First, Seibert pled guilty and was convicted and sentenced to two thirty-year terms in prison for a 1986 kidnapping and attempted first-degree murder. In committing these of
 
 *80
 
 fenses, Seibert abducted a female British tourist at knife-point from a phone booth across the street from her Miami Beach hotel and then left her the next day naked from the waist down in a wooded area in Broward County with massive head wounds from being struck with a porcelain toilet. She recovered but had no memory of the incident. Second, Seibert also pled guilty and was convicted and sentenced to two fifteen-year terms in prison for a 1986 burglary and attempted kidnapping, which occurred four days prior to the former offenses. These latter two offenses occurred when Michelle Kendricks stayed in her car while Leon Golden went into a convenience store in Broward County, and Seibert then jumped into the car and attempted to drive away but Michelle escaped. Seibert was sentenced for all these crimes on January 5, 1987, was released on March 11, 1997, and then committed the present crime a year later, on March 17, 1998.
 

 [12]
 

 . The Florida Evidence Code has since been amended to provide as follows: "If the court has made a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.”
 
 In re Amendments to Fla. Evidence Code,
 
 914 So.2d 940, 942 (Fla.2005).