# Supreme Court of Florida

_____

No. SC20-60
_____

**CHRISTIAN CRUZ,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 1, 2021

PER CURIAM.

Christian Cruz appeals his convictions for first-degree murder and other crimes and sentence of death.[1]  For the reasons explained below, we affirm Cruz's convictions but reverse and remand for the limited purpose of resentencing by the trial court and a new sentencing order.

---

1.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.

## BACKGROUND

In 2013, Christian Cruz and codefendant Justen Charles were indicted for the first-degree murder of Christopher Jemery, as well as burglary while armed, robbery with a firearm, and kidnapping. Cruz and Charles were tried separately but before the same trial court. Charles' trial occurred after Cruz's trial but before Cruz's sentencing. The evidence presented at Cruz's trial showed that on April 26, 2013, Jemery was attacked in his Deltona apartment. The evening before the attack, both Cruz and Charles were together in an apartment in the vicinity of Jemery's apartment. Cruz and Charles were aware that the former resident of the apartment where Jemery was living sold drugs out of the apartment, and Cruz and Charles discussed Jemery's apartment the day before the murder.

The evidence showed that both Cruz and Charles forcefully entered Jemery's apartment. The physical evidence obtained from the apartment showed that there was an assault and attack on Jemery. Blood throughout the apartment demonstrated that Jemery was beaten while inside the apartment. Bloody footprints matching the shoes of Cruz and Charles were found inside the apartment. One of the bedrooms appeared ransacked and had

- 2 -

additional blood, the kitchen cabinets had been opened, and a television was taken from the apartment.

Cruz and Charles then placed Jemery in the trunk of Jemery's rental car, drove him to a remote location, and shot him in the head. Jemery was found near the Sanford airport in Seminole County, Florida. Workers at an industrial area saw what they thought was the body of a person lying on the ground in a field adjacent to their warehouse. Because the body lacked identification, the person was given the name of John Doe. John Doe was later identified as Christopher Jemery.

Upon first arrival at the field, emergency personnel made a notation that Jemery was bound with wire and duct tape on his arms and mouth, was alive but nonresponsive, and his breathing was very shallow. Medical examiner testimony would later reveal that Jemery was shot in the head and also sustained a number of injuries to his head, face, hands, and torso, including cuts, bruises, lacerations, and defensive wounds. His wrists showed what appeared to be tape residue from being bound with duct tape. Jemery initially survived the attack but succumbed to his injuries in a hospital within a day.

Evidence showed that the duct tape recovered from the area where Jemery was found matched the leftover roll of duct tape found in Jemery's apartment. A live .22 bullet was found on the floor of Jemery's apartment, which was the same caliber and manufacturer as the .22 shell casing found near Jemery's body. Cruz's fingerprint was found on a piece of duct tape recovered from Jemery's body. Cruz's DNA was found on a swab of blood taken from the front right kick panel and the right front door of Jemery's rental car. Cruz's fingerprint was also found on the Air Jordan shoe box found at Jemery's apartment and on Jemery's cell phone, which was recovered from his rental car. Jemery's rental car was not at his apartment and was later found backed into some bushes near a grocery store in Deltona. The evidence also showed that the same night Jemery was taken from his apartment, Cruz was seen on a bank's ATM surveillance camera using Jemery's bank card and personal identification number (PIN) to withdraw $440 cash from Jemery's account.

At the time of his death, Jemery was renting his apartment from a friend, Mark Walters. Jemery had recently returned to Florida with his girlfriend and young daughter. Walters had

previously lived in the apartment in Deltona but had recently vacated the apartment. Walters allowed Jemery to reside in the apartment but retained the ability to go into and out of the apartment. Walters was also a small-time drug dealer who sold drugs from and around his apartment when he lived there. When Jemery took residence in Walters' apartment, he concluded that the area was not safe. Although he planned to have his girlfriend and young child move into the apartment with him, he asked his girlfriend not to do so because he was concerned for their safety. Instead, his girlfriend moved in with her family who also lived near the area.

The morning of April 26, 2013, Walters came by the apartment and noticed that there was a large amount of blood on the floor of the apartment. He did not see Jemery and assumed that somehow Jemery had injured himself. Walters did not call the police. Testimony also established that a prescription bottle belonging to Walters was later recovered from Charles' vehicle after Jemery was killed. Christina Raghonath, Jemery's girlfriend, also stopped by Jemery's apartment that morning and called the police when she

saw what she described as a "blood bath." Raghonath later went to the hospital to identify Jemery when he was found.

On the evening of May 9, 2013, Cruz was arrested on unrelated charges. Officers Cage and Hilliker of the Orlando Police Department were on patrol at night in Parramore, a high-crime and high-drug area. They witnessed a white sedan driving erratically and making numerous traffic violations, so they tried to initiate a traffic stop but lost sight of the vehicle. After they conducted an area search for the vehicle, they found what they thought was the same white sedan parked nearby. The vehicle was still hot when they found it, and as they checked the license tag of the vehicle, they noticed a male peeking around the corner of the surrounding townhomes several times over a period of 10 to 15 minutes. Officers Cage and Hilliker went around the corner where the male was standing and came upon 3 individuals. As they approached, the officers smelled the odor of burnt cannabis coming from the 3 individuals. Officer Cage asked one of the individuals, who ultimately went unidentified, if he had anything illegal on him. The man said he did not and consented to a search, during which Officer Cage failed to find anything. After searching the first male,

Officer Cage turned to the next male, later identified as Cruz. Officer Hilliker observed that Cruz was very nervous. Officer Cage asked Cruz to stand and come to him and asked him if he had anything illegal on him. Cruz responded that he did not. After Cruz took a step or two towards the officers, and while in between them, Cruz started running.

After both officers ran after Cruz for about 15 feet and requested him to stop, Officer Cage deployed his taser on Cruz, resulting in Cruz falling to the ground. Officer Hilliker handcuffed him but could not cuff the second hand until Officer Cage deployed a second cycle of the taser. Officer Hilliker immediately stood Cruz up and searched him. They did not find any drugs, drug paraphernalia, or vehicle keys. When they walked Cruz back to the patrol vehicle and sat him on the curb, Cruz said something to the effect of, "Why don't you just kill me now," and "I'm as good as dead."

Before the trial, Cruz filed a motion to suppress and motion in limine regarding the statements Cruz made to the officers upon arrest. The trial court held an evidentiary hearing on Cruz's motion to suppress and heard the testimony of Officers Cage and Hilliker.

The trial court denied the motion to suppress, finding "that the officers conducted the stop legally based upon the circumstances." The trial court issued a written order finding as follows:

> The court finds that the officers, based on the totality of the circumstances had a basis for conducting an investigation. In this case, the defendant's action of:
> 1. spying around the corner of the building or otherwise acting in a suspicious manner,
> 2. acting nervous when approached,
> 3. being in an area where the odor of cannabis was prevalent,
> 4. running after another person had been searched in his presence,
> 5. at night,
> 6. being in a high crime/high drug area,
> constitute a sufficient basis and creates a reasonable articulable suspicion for detention, and subsequent probable cause for arrest as the concealed firearm was found on him.

The trial court also denied Cruz's motion in limine, finding that the statements were relevant and that "given the nature and magnitude of the allegations of [the] crime," the statements were reasonably related to "flight to avoid prosecution."

The guilt phase of trial began on February 18, 2019. During voir dire, a prospective juror asked the trial judge if the jury is allowed to ask questions of the witnesses during trial. The trial judge responded that it depends but generally no. The trial court

- 8 -

explained, "Now, if there's something that I believe that needs to be explored, I may let the lawyers know that they need to ask the witness more questions about it. But the evidence that comes from the witness stand, that's the evidence you have to use and apply." The trial court further explained that there are rules of evidence that apply to a witness' testimony and the lawyers have the burden of asking the right questions. Defense counsel did not object during voir dire.

In the State's opening statement at trial, the prosecutor stated the following:

> This was a violent and senseless crime, and Christian Cruz has been indicted for the crimes of first degree murder, burglary while armed, robbery with a firearm, and kidnapping for his participation in the event of April 26 that led to the killing of this innocent young man.
> . . . .
> Ladies and gentlemen, death is always tragic, but this case is particularly upsetting. The evidence will show that Christopher Jemery was nobody. He was a normal person. He had a normal life. He didn't bother anybody. And he was minding his own business when he was murdered in this violent and senseless crime.
> Two unbelievably brutal strangers invaded his home in the middle of the night and ransacked his apartment, in search of drugs. The facts will show that he was beaten and robbed, kidnapped and thrown in the trunk of his own car, that he was driven to the middle of nowhere, shot in the head and left to die in a ditch, and

that somewhere along this continuum of unspeakable acts, Cruz was able to get Christopher Jemery's PIN and access his accounts. Then the defendants went about their lives as if it were any other day, and Christopher Jemery's family waited at the hospital.

Defense counsel did not object to the prosecutor's comments.

During the guilt phase of Cruz's trial, the State presented the testimony of 17 witnesses. The State did not, however, present at Cruz's trial 2 items of evidence that it did introduce at the trial of Charles: first, the testimony of Charles' girlfriend that she had seen Cruz with a .22 caliber firearm, and second, a stipulation between the State and Charles' trial counsel that Cruz was the shooter.

Cruz's defense counsel did not present any witnesses but introduced a stipulation—that the injury Jemery suffered when he was shot made him immediately unable to feel pain. Cruz elected not to testify. Defense counsel renewed its objection to prior rulings on pretrial motions, including the motion to suppress. The trial court announced that its ruling would stand. Officer Cage's testimony at trial closely resembled his testimony from the motion to suppress hearing.

On February 28, 2019, the jury found Cruz guilty of first-degree premeditated and felony murder, burglary while armed,

- 10 -

robbery with a firearm, and kidnapping. The jury made special findings on the verdict form that Cruz possessed a firearm during the commission of the crimes and that Cruz discharged a firearm causing the death of Jemery.

The penalty phase of trial began on March 4, 2019. The State presented 5 witnesses, the defense presented 21 witnesses (including Cruz's sister, who testified about Cruz's difficulties as a young person), and the State called 1 rebuttal expert witness. In the State's opening statement during the penalty phase, the prosecutor stated the following:

> And this is the part in the trial where you're going to be asked to consider is the death penalty an appropriate sentencing recommendation for Christian Cruz, given the facts and circumstances in this case.
> As the prosecution, this is not something that we take lightly because, as we discussed, not every murder is one that would be considered for the death penalty. So we take it very seriously when we present this case to you as one that you should consider the death penalty.

During the penalty phase, the State presented the testimony of Deandre Perez, a former manager of Hungry Howie's in Sanford. Perez was working a shift when two individuals (later identified as Cruz and Charles) entered through the back door unexpectedly. One of the men grabbed a female employee by her hair while the

other walked up to Perez and hit him in the face with a gun. Perez was hit twice by one of the men holding a gun, once above his eyebrow and once on the cheek. Perez gave them the money in the till, and they left. A surveillance video capturing the robbery was also introduced into evidence, along with Cruz's judgment and sentence resulting from the robbery.

The State's expert, Dr. William Riebsame, testified during the State's rebuttal at the penalty phase. Dr. Riebsame testified that Cruz reported that he committed the crime because he needed the money for drugs, and Cruz told him that he had previously robbed a drug dealer in a similar manner. Defense counsel did not object.

In the State's closing argument during the penalty phase, the prosecutor made the following statements, relevant to the issues Cruz raises here:

> And there's at least one other person who grew up in exactly the same circumstances, had exactly the same risk and protective factors that we went through ad nauseum yesterday, except that she was a female, and she was one or two years older. She turned out fine. She's not calling a long list of friends to dig her out of a hole. She's not torching their mother in public to improve her circumstances.
> . . . .
> Christian Cruz suffered a head injury when he was a kid. He was struck by a golf club as a preteen. That

- 12 -

has absolutely no bearing. None. It's an event that occurred in his life. Sure. But it was never connected by any doctors to traumatic brain injury. There's no evidence that it bothers him today. In fact, the opposite's true. Both of the experts who testified yesterday said that they were not aware of any medical or psychological significance for this superficial childhood injury.

That the defendant never received mental health treatment or counseling prior to his arrest, there's no dispute. But how important is that? He had ADHD and bipolar disorder. Those are not conditions that blur the line between right and wrong.

When he made the decision to shoot [Jemery] in the head, he knew that he was committing murder. His untreated mild to moderate mood disorder is not nearly as significant as the choices that he made on April 26 of 2013. And the fact that he tried to commit suicide in an effort to escape the isolation and loneliness of incarceration, that's not the kind of mitigation that should be important—more important or more significant than the torturous death of another human being.

. . . .

This was a brutal crime. It's the kind of crime that frightens you to your core. It's the reason that children fear the darkness. It's why people have locks on their doors and keep guns for protection. . . .

. . . .

You know they talked about it. [Jemery] laid there bound and gagged, forced to listen to them. When they were satisfied that they had taken everything of value from his home, you know, there was a conversation about how it was going to end. That poor man had to listen to it.

Then they took him. He was loaded in the trunk of his own car. His hands—or his mouth covered, his hands bound, wrapped, tied with wire and tape behind his back. The victim controlled by his captor, bound and gagged, injured and bleeding, [Jemery] was en route to the scene of his own murder. And there was nothing he

- 13 -

could do about it. Eighteen minutes of drive time. Eighteen minutes is an eternity when all you can do is contemplate how your life is going to end.

The jury rendered a verdict unanimously recommending a penalty of death, determined the aggravating factors outweighed the mitigating circumstances, and found that the State had established beyond a reasonable doubt the existence of the following aggravating factors: (1) Cruz was previously convicted of a felony involving the use or threat of violence to another person; (2) the first-degree murder was committed while Cruz was engaged in a robbery, burglary, or kidnapping; (3) the first-degree murder was committed for the purpose of avoiding arrest; (4) the first-degree murder was committed for financial gain; (5) the first-degree murder was especially heinous, atrocious, or cruel (HAC); and (6) the first-degree murder was committed in a cold, calculated, and premeditated manner (CCP).

A *Spencer*[2] hearing was held on June 5, 2019. The trial court delayed imposition of Cruz's sentence until the conclusion of Charles' trial. The defense called 3 witnesses, and Cruz gave a

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

statement expressing his remorse and apologizing to Jemery's family. Sentencing occurred on December 18, 2019, and the trial court followed the jury's recommendation and sentenced Cruz to death. The trial court found 5 aggravating factors: (1) Cruz was previously convicted of a felony involving the use or threat of violence to another person for the Hungry Howie's robbery committed shortly after murdering Jemery (great weight); (2) the first-degree murder was committed while Cruz was engaged in a robbery, burglary, or kidnapping, merged with the first-degree murder was committed for financial gain (great weight); (3) the first-degree murder was committed for the purpose of avoiding arrest (great weight); (4) the first-degree murder was especially heinous, atrocious, or cruel (great weight); and (5) the first-degree murder was committed in a cold, calculated, and premeditated manner (great weight). The trial court considered and found as proven all 37 of Cruz's proffered mitigators, assigning slight weight to 24, moderate weight to 11, great weight to 1, and extraordinarily great weight to 1.[3]

---

3. The trial court found the following mitigating circumstances with the respective assigned weights: (1) Cruz's

family has a generational history of alcoholism, depression, and suicide (moderate weight); (2) Cruz was raised in a home environment that did not express love and affection (slight weight); (3) Cruz was raised by a mother with poor parenting skills (slight weight); (4) Cruz had to move frequently throughout his childhood (moderate weight); (5) Cruz's mother relied on her religious faith to his detriment (slight weight); (6) Cruz's mother struggled financially throughout his life (slight weight); (7) Cruz was abandoned by his father when he was 3 years old (moderate weight); (8) Cruz's mother lacked any local familial support (slight weight); (9) Cruz was raised in a Spanish-only speaking home for several years (slight weight); (10) Cruz's mother did not encourage assimilation with American culture when he was young (slight weight); (11) Cruz was socially isolated as a child (slight weight); (12) Cruz witnessed domestic violence committed by Charles Garrett for several years while a young boy (great weight); (13) Cruz and his family lost property and memorabilia due to evictions (moderate weight); (14) Cruz suffered a serious head injury when he was 9 years old (slight weight); (15) Cruz struggled academically due to his limited ability to speak English (moderate weight); (16) Cruz was bullied in middle school (slight weight); (17) Cruz was ridiculed for his appearance when he was a young teenager (slight weight); (18) Cruz began using marijuana when he was a young teenager (moderate weight); (19) Cruz suffered from depression and bipolar disorder (moderate weight); (20) Cruz never received mental health treatment or counseling before his arrest (moderate weight); (21) Cruz grew up ashamed of his family's poverty (slight weight); (22) Cruz shielded his younger brother from his criminal activities (slight weight); (23) Cruz was a positive influence on his younger brother (slight weight); (24) Cruz was a positive influence on his friend, Brandon (slight weight); (25) Cruz was deeply conflicted about religion (slight weight); (26) Cruz was misguided by his mother's religious views (slight weight); (27) Cruz became employed after moving to New York (slight weight); (28) Cruz was 19 years old at the time of the offense (extremely great weight); (29) Cruz has no significant history of prior criminal activity (moderate weight); (30) Cruz was an accomplice in the first-degree murder committed by another person and his participation was relatively minor (slight weight); (31) the

- 16 -

In its sentencing order, the trial court conducted an *Enmund*[4]-*Tison*[5] analysis, finding as follows:

> The jury found Mr. Cruz to be the individual who shot and killed Mr. Jemery. In Mr. Charles's case, the State abandoned any efforts to establish Mr. Charles as the shooter. The jury in Mr. Charles' case did not have to make a determination as to who the shooter was because of the State's concession. However, the jury in Mr. Charles' case did find him guilty of both, premeditated murder AND felony murder.
> Therefore, this court finds that Mr. Cruz in fact killed Mr. Jemery and no further analysis is needed.

In the sentencing order, the trial court explained that he heard and considered evidence of the case in Cruz's and codefendant Charles' trials. Further, in addressing the mitigating circumstance

---

first-degree murder was committed while Cruz was under the influence of extreme mental or emotional disturbance (slight weight); (32) the capacity of Cruz to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight); (33) Cruz acted under extreme duress or under the substantial domination of another person (slight weight); (34) Cruz first received mental health medication while incarcerated (slight weight); (35) Cruz has demonstrated remorse (moderate weight); (36) Cruz has suffered permanent brain damage (slight weight); and (37) Cruz was negatively influenced by a former gang member during adolescence (slight weight).

4. *Enmund v. Florida,* 458 U.S. 782 (1982).

5. *Tison v. Arizona,* 481 U.S. 137 (1987).

that Cruz acted under extreme duress or under the substantial domination of another person, the trial court found that Cruz and Charles "were equally culpable for the actions of each other."

This direct appeal followed.

## ANALYSIS

Cruz raises the following 14 claims on appeal: (1) the trial court improperly denied Cruz's motion to suppress statements he made to officers upon arrest; (2) the trial court improperly denied Cruz's motion in limine to exclude the officer's testimony regarding Cruz's statements made upon arrest; (3) the trial court improperly informed the jurors during voir dire that they would not be allowed to ask witnesses questions during trial; (4) the prosecutor made improper comments during guilt-phase opening statement; (5) there is insufficient evidence to support the jury's findings that Cruz possessed and discharged a firearm; (6) the cumulative effect of the errors in the guilt-phase claims; (7) the prosecutor made improper comments during penalty-phase opening statement; (8) the prosecutor made improper comments during penalty-phase closing argument; (9) the trial court improperly admitted evidence of Cruz's prior robbery conviction; (10) the trial court improperly admitted

testimony of the State's expert that Cruz was involved in a prior robbery of a drug dealer; (11) the trial court failed to instruct the jury to make an *Enmund-Tison* finding in the penalty-phase verdict; (12) the trial court's sentencing order had individual and cumulative errors requiring reversal; (13) Florida's capital punishment scheme is unconstitutional; and (14) the cumulative effect of the error as to penalty-phase claims. We also consider (15) whether there is sufficient evidence to sustain Cruz's murder convictions.

We affirm Cruz's convictions but reverse and remand for the limited purpose of resentencing by the trial court and a new sentencing order because the trial court relied on nonrecord evidence from the trial of the codefendant Charles in finding that Cruz was the shooter and sentencing Cruz to death.

### 1. *Motion to Suppress*

Cruz first argues that the trial court erroneously denied his motion to suppress his unsolicited statements made to the police following his arrest on May 9, 2013, when he said something to the effect of, "why don't you just kill me now," and "I'm as good as

- 19 -

dead." Cruz argues that his detention was illegal because the police had no reasonable basis to conduct an investigatory stop.

At the time Cruz made his spontaneous, unsolicited statements, however, he had been arrested, and prior to his arrest, he had been lawfully stopped. As the trial court correctly found, Cruz's behavior prior to his detention generated in the minds of the arresting officers a reasonable suspicion that Cruz was engaged in criminal activity.

This Court has explained the standard for reviewing a trial court's ruling on a motion to suppress:

> "A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." In reviewing a trial court's ruling on a suppression motion, this Court conducts a two-step analysis in which we determine whether (1) competent, substantial evidence supports the trial court's findings of historical fact; and (2) the trial court reached the correct legal conclusion.

*Jackson v. State,* 18 So. 3d 1016, 1027 (Fla. 2009) (quoting *Rolling v. State,* 695 So. 2d 278, 291 (Fla. 1997)). Further, "[a]s long as the trial court's findings are supported by competent substantial evidence, 'this Court will not "substitute its judgment for that of the

- 20 -

trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.' ' " *Blanco v. State*, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting *Demps v. State*, 462 So. 2d 1074, 1075 (Fla. 1984)).

In denying Cruz's motion to suppress, the trial court relied on evidence from the testimony of Officers Cage and Hilliker. The trial court found as follows:

> The court finds that the officers, based on the totality of the circumstances had a basis for conducting an investigation. In this case, the defendant's action of:
> 1. spying around the corner of the building or otherwise acting in a suspicious manner,
> 2. acting nervous when approached,
> 3. being in an area where the odor of cannabis was prevalent,
> 4. running after another person had been searched in his presence,
> 5. at night,
> 6. being in a high crime/high drug area,
>
> constitute a sufficient basis and creates a reasonable articulable suspicion for detention, and subsequent probable cause for arrest as the concealed firearm was found on him.

The trial court's findings are supported by competent, substantial evidence in the record. On May 9, 2013, Cruz was arrested on unrelated charges. Officers Cage and Hilliker were patrolling at night in Parramore, a high-crime and high-drug area.

- 21 -

They witnessed a white sedan driving erratically and making numerous traffic violations. After they conducted an area search for the vehicle, they found what they thought was the same vehicle, and they both noticed a male (later determined to be Cruz) suspiciously peeking around the corner of the surrounding townhomes while they were near the vehicle. When they approached Cruz and 2 other individuals, they smelled burnt cannabis. After searching one of the individuals with consent, Officer Cage asked Cruz to stand up and approach him and asked Cruz if he had anything illegal on him. Cruz began running away and did not heed to Officer Cage's command to stop. Once he was detained, Cruz resisted handcuffs, repeatedly reaching toward his waist area. For this reason, the officers subdued him with a taser and handcuffed him. A search incident to Cruz's arrest revealed a .22 caliber handgun in Cruz's front left pocket.[6]

"[This] Court has identified three levels of police-citizen encounters: 1) a consensual encounter involving minimal contact

---

6. Officer Hilliker testified during the hearing on Cruz's motion to suppress that he found a .22 caliber handgun with the serial number filed off in Cruz's left front pocket. However, this testimony was not elicited at trial.

during which the citizen is free to leave; 2) an investigatory stop or detention which requires a well-founded, articulable suspicion of criminal activity; and 3) an arrest supported by probable cause that a crime has been committed, or is being committed." *R.F. v. State*, 307 So. 3d 20, 22-23 (Fla. 4th DCA 2020) (citing *Taylor v. State*, 855 So. 2d 1, 14-15 (Fla. 2003)). In order to justify an investigatory stop, a police officer must have a well-founded suspicion that the person detained has committed, is committing, or is about to commit a crime. *See* § 901.151(2), Fla. Stat. (2019); *see also Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Reasonable suspicion must be based on "specific and articulable facts" and not on "inchoate" and "unparticularized suspicion" or mere "hunch." *Terry*, 392 U.S. at 21, 27. "In determining whether a police officer possesses a reasonable suspicion to justify an investigatory stop, the court must consider the totality of the circumstances viewed in light of a police officer's experience and background." *State v. Lennon*, 963 So. 2d 765, 768 (Fla. 3d DCA 2007). " 'Reasonable suspicion' is a less demanding standard than that for probable cause, and 'considerably less than proof of wrongdoing by preponderance of the

evidence.' " *State v. Gonzalez*, 682 So. 2d 1168, 1170 (Fla. 3d DCA 1996) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The evidence supports the conclusion that the officers had sufficient reasonable articulable suspicion to conduct an investigatory stop based on the totality of the circumstances, including Cruz's suspicious behavior spying around the corner and acting nervous when approached, the high crime area at night, the smell of cannabis, and running from the officers after another person with Cruz was searched. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see also Hernandez v. State*, 784 So. 2d 1124, 1126 (Fla. 3d DCA 1999) ("Some of the factors . . . which may be evaluated by police officers to reasonably suggest a suspect's possible commission, the existence, or imminence, of a crime are: The time; the day of the week; the location; the physical appearance of the suspect; the behavior of the suspect; the appearance and

manner of operation of any vehicle involved; anything incongruous or unusual in the situation as interpreted in the light of the officer's knowledge. To this list may be added, the factor of flight." (quoting *State v. Bell*, 382 So. 2d 119, 119 (Fla. 3d DCA 1980))).

Because the officers had the necessary reasonable suspicion of criminal activity to detain Cruz, his later unprovoked utterances to the police were admissible evidence. Competent, substantial evidence supports the trial court's findings of fact, and its evidentiary ruling was correct as a matter of law. Accordingly, we affirm the trial court's denial of Cruz's motion to suppress.

### 2. *Motion in Limine*

Cruz next argues that the trial court erroneously denied Cruz's motion in limine to exclude Officer Cage's testimony about Cruz's unsolicited statements upon being arrested, stating something to the effect of, "why don't you just kill me now," and "I'm as good as dead." Specifically, Cruz argues that the testimony regarding his statements was inadmissible because his statements were not relevant and not related to the homicide.

This Court will not overturn a trial court's ruling on admissibility of evidence absent abuse of discretion by the trial

court.  *Dessaure v. State*, 891 So. 2d 455, 466 (Fla. 2004).  "The credibility of the witnesses and the weight of the evidence presented are matters within the province of the trial judge, whose determinations of factual questions must be accepted by the appellate court if the record supports that finding."  *State v. Polak*, 598 So. 2d 150, 152 (Fla. 1st DCA 1992).

At trial, Officer Cage testified that immediately after Cruz's arrest, the officers had Cruz sitting on a curb next to the police car.  Cruz made statements to the officers, including something to the effect of, "Why don't you just shoot and kill me now," and "I'm as good as dead."  The trial court denied Cruz's motion in limine to exclude the testimony of Officer Cage.  Specifically, the trial court found that the testimony was relevant and reasonably related to flight to avoid prosecution.

Evidence that a suspect "in any manner attempts to evade prosecution after a crime has been committed" is admissible and relevant to the consciousness of guilt.  *Penalver v. State*, 926 So. 2d 1118, 1132 (Fla. 2006).  "[T]here must be evidence which indicates a nexus between the flight . . . and the crime(s) for which the defendant is being tried in that specific case."  *Escobar v. State*, 699

So. 2d 988, 995 (Fla. 1997), *abrogated on other grounds by Connor v. State*, 803 So. 2d 598, 607 (Fla. 2001). Where there are two conflicting theories as to the meaning of evidence tending to show consciousness of guilt, the trial court does not abuse its discretion in admitting such evidence, as "the conflict in the theories goes to the weight to be accorded this evidence, not its admissibility." *Penalver*, 926 So. 2d at 1133.

Cruz's unsolicited statements indicate that he was aware of the criminality of his actions and knew the police had a reason to arrest him when he was stopped by the officers. His statements were made after Cruz attempted to flee from officers. *See Thomas v. State*, 748 So. 2d 970, 982-83 (Fla. 1999) (upholding the trial court's admission of flight evidence because the flight from police occurred in the same city as the murder and only eleven days after the murder). Additionally, Cruz's statements were made on May 10, 2013, just two weeks after the homicide on April 26, 2013. *See Partin v. State*, 82 So. 3d 31, 42 (Fla. 2011) (finding a sufficient nexus even "[t]hough approximately one year had passed since the time of the crime"). Accordingly, because Officer Cage's testimony regarding Cruz's unsolicited statements subsequent to arrest were

- 27 -

relevant to Cruz's awareness of criminal conduct and reasonably related to flight to avoid prosecution, we deny relief on this claim.

### 3. *Juror Questions*

Cruz argues that the trial judge erred when he informed potential jurors during voir dire that they generally would not be able to ask witnesses questions during trial. Because defense counsel did not object, we review that claim for fundamental error, defined as error that reaches down into the validity of the trial itself to the extent that the jury's recommendation of death could not have been obtained without the assistance of the alleged error. *Smiley v. State*, 295 So. 3d 156, 172 (Fla. 2020).

Florida Rule of Criminal Procedure 3.371(a) provides, "[a]t the discretion of the presiding trial judge, jurors *may* be allowed to submit questions of witnesses during the trial." (Emphasis added.) This Court has explained that the trial judge has discretion in allowing a juror to ask questions of a witness. *See Ferrara v. State*, 101 So. 2d 797, 801 (Fla. 1958) (explaining that "upon appropriate occasion a trier of fact might be completely justified in propounding a question" when the procedure is "controlled by the discretion of the trial judge").

During voir dire, a prospective juror asked the trial judge if jurors would be allowed to ask questions of witnesses during trial. The trial judge responded that "[g]enerally the answer is no." The court explained that juror questions could call for hearsay or other matters not properly to be introduced into evidence. We cannot say that this answer and explanation constitutes fundamental error. Cruz has failed to demonstrate how this exercise of the court's discretion reached down into the validity of the trial itself to the extent that the jury's recommendation of death could not have been obtained without the assistance of the alleged error. *See* Fla. R. Crim. P. 3.371(a).

Cruz also argues that the trial court's decision was improper because the trial court did not consult with defense counsel before making the decision, citing to *Mills v. State*, 620 So. 2d 1006 (Fla. 1993). This Court's decision in *Mills* does not help Cruz. In that case, we concluded that the trial judge's failure to give counsel the opportunity to be heard before answering the jury's question of law during jury deliberations was reversible error. *Id.* at 1007-08. The case did not address jury questioning of witnesses during trial.

Accordingly, Cruz's argument is without merit, and we deny relief on this claim.

### 4. *Prosecutor's Guilt-Phase Comments*

Next, Cruz challenges a number of comments made by the prosecutor during the State's guilt-phase opening statement. Cruz did not object to the prosecutor's comments; therefore, we review such claims for fundamental error.

First, Cruz challenges the prosecutor's comment that Jemery's death was "particularly upsetting," relying on this Court's decisions in *Heath v. State*, 648 So. 2d 660 (Fla. 1994), and *Duest v. State*, 462 So. 2d 446 (Fla. 1985). In *Heath*, the prosecutor's comment to the jury was, "You're going to hear testimony, ladies and gentlemen, from the only person who can tell you about what [the defendant] did. [The victim] is dead; he can't tell you what happened. [The defendant] is going to come before you and tell you how [the victim] died." 648 So. 2d at 663. In *Duest*, the prosecutor insulted defense counsel during cross-examination of a witness. 462 So. 2d at 448. However, the language in these cases is materially distinguishable. In the present case, the prosecutor's use of the phrase "particularly upsetting," when considered against the weight of all of the evidence

presented, "did not go to the heart of the case" and was "not critical to the jury's verdict." *Davis v. State*, 136 So. 3d 1169, 1204 (Fla. 2014) (quoting *Braddy v. State*, 111 So. 3d 810, 843-44 (Fla. 2012)). Cruz fails to show how this alleged error reached down into the validity of the trial itself to the extent that the jury's recommendation of death could not have been obtained without the assistance of the alleged error.

Next, Cruz challenges the prosecutor's comments that Cruz's actions were "unspeakable acts" and "violent and senseless," and the prosecutor's comment describing Cruz and Charles as "[t]wo unbelievably brutal strangers." In *Lugo v. State*, 845 So. 2d 74 (Fla. 2003), the prosecutor argued "the 'awful,' 'evil,' 'horrible,' and 'gruesome' nature of the crimes; that Lugo and other defendants were 'preying' on their victims; that Lugo's offenses were worse than 'any war crime'; that the circumstances of Lugo's case sometimes resembled an 'Iranian hostage' situation; and that Lugo and other defendants participated in a 'human barbecue' of the murder victims." *Id.* at 100 n.51. In light of defense counsel's failure to object, this Court concluded that "when viewed in the totality of the circumstances of [the defendant]'s case, the prosecution's

comments [did not drift] so far afield from the evidence adduced at trial as to constitute fundamental error." *Id.* at 100 n.51, 101.

Here, the prosecutor's comments were connected to the evidence that was adduced at trial. The State presented evidence that Cruz and Charles broke into Jemery's apartment, beat him, tied up and gagged him, drove him to a remote location before shooting him, left him at that remote location, and used Jemery's ATM card to withdraw cash. Accordingly, the prosecutor's comments do not amount to fundamental error.

Finally, Cruz argues that the prosecutor stating that Jemery's family "waited at the hospital" while Cruz and Charles "went about their lives as if it were any other day," improperly appealed to the sympathy of the jurors. This Court has explained that a prosecutor "should not attempt to elicit the jury's sympathy by referring to the victim's family." *Johnson v. State*, 442 So. 2d 185, 188 (Fla. 1983). However, Cruz failed to object and failed to explain how the jury's verdict was affected by the State's argument and that such a verdict would not have been rendered otherwise. Further, the prosecutor's comment was consistent with testimony elicited at trial that Jemery's girlfriend, Christina Raghonath, went to the hospital to be

with Jemery. *See Lugo*, 845 So. 2d at 101 ("[W]e cannot say . . . the prosecution's comments drifted so far afield from the evidence adduced at trial as to constitute fundamental error."). Accordingly, we deny relief on this claim.

### 5. *Jury Findings that Cruz Possessed and Discharged a Firearm*

The jury found Cruz guilty of first-degree premeditated and felony-murder, burglary while armed, robbery with a firearm, and kidnapping. By special verdict in connection with each charged crime, the jury also found that Cruz possessed a firearm and discharged a firearm during the commission of the crime causing the death of Jemery. Cruz argues that there was insufficient evidence to support the jury's verdict findings that Cruz possessed and discharged a firearm. We agree and conclude that there is no competent, substantial evidence in the record to support the jury's findings.

However, as addressed in more detail below, competent, substantial evidence supports Cruz's convictions for first-degree murder. Further, the entire episode was a joint operation by Cruz and Charles. Evidence presented at trial demonstrated that Cruz

- 33 -

and Charles broke into Jemery's apartment, that the shoes of both their feet left prints of Jemery's blood there, that they were both in the car in which Jemery was driven into the woods, and that they were seen together on surveillance video the night Jemery was killed. It was Cruz's fingerprint on the duct tape recovered from Jemery's body, and Cruz's DNA was found on a swab of blood in the car. Cruz's trial jury thus heard evidence that he was present and actively participated in the events leading to Jemery's death. In similar cases, we have declined to reverse convictions, and indeed upheld imposition of a sentence of death. *See James v. State*, 453 So. 2d 786, 792 (Fla. 1984) ("[W]ho is the actual killer is not determinative because each participant is responsible for the acts of the other."); *see also Farina v. State*, 801 So. 2d 44, 56 (Fla. 2001) (upholding death sentence of the defendant who was not the shooter); *Ferrell v. State*, 686 So. 2d 1324, 1329 (Fla. 1996) ("While Ferrell may not have actually pulled the trigger, the evidence establishes that he played an integral part in these crimes and in actually luring the victim to this death. Thus, at a minimum, he is guilty as a principal under the statute."); *Hall v. State*, 403 So. 2d 1321, 1323 (Fla. 1981) ("These facts support the jury's conclusion

that, even if [the defendant] did not pull the trigger, he was a principal to the crime of murder."). Here, too, we find ample evidence to support the jury's conclusion that Cruz was a principal to Jemery's murder.

### 6. Cumulative Effect of Guilt-Phase Errors

In his final guilt-phase claim, Cruz argues that the cumulative effect of the alleged errors during the guilt phase deprived him of a fair trial. Where multiple errors are discovered, it is appropriate to review the cumulative effect of those errors because even with competent, substantial evidence to support a verdict, "and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation." *McDuffie v. State*, 970 So. 2d 312, 328 (Fla. 2007) (alterations in original) (quoting *Brooks v. State*, 918 So. 2d 181, 202 (Fla. 2005)). But relief is not warranted if there is "no reasonable probability that the cumulative effect of these errors affected [the defendant's] right to a fair trial." *Floyd v. State*, 850 So. 2d 383, 408 (Fla. 2002).

We concluded above that there is no competent, substantial evidence to support the jury's special verdict findings that Cruz possessed and discharged a firearm; however, as explained, any error was harmless. We also conclude that this error did not deprive Cruz of a fair trial, and we find no merit to Cruz's cumulative error claim as to the guilt phase in this case.

### 7. and 8. Prosecutor's Penalty-Phase Comments

Cruz argues that the prosecutor made inappropriate comments in its penalty-phase opening statement and closing argument. Cruz did not object to the prosecutor's comments, so we review the statements for fundamental error. *See Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996) ("We have held that allegedly improper prosecutorial remarks cannot be appealed unless a contemporaneous objection is recorded."). "Error during the penalty phase is fundamental if it is 'so prejudicial as to taint the jury's recommended sentence.' " *Jones v. State*, 949 So. 2d 1021, 1037 (Fla. 2006) (quoting *Fennie v. State*, 855 So. 2d 597, 609 (Fla. 2003)).

During penalty-phase opening statements, the prosecutor stated, "As the prosecution, this is not something that we take

lightly because, as we discussed, not every murder is one that would be considered for the death penalty. So we take it very seriously when we present this case to you as one that you should consider the death penalty."

The trial court did not commit fundamental error when it allowed the State's comment during opening statement. In *Davis*, this Court analyzed whether the prosecutor made an improper argument in stating, "As we talked about in jury selection, you know the State of Florida does not seek the death penalty in every case, because it's not just proper in every case. But I submit to you, in this case, it most certainly is." 136 So. 3d at 1206. This Court concluded that this argument was improper, but cumulatively the comments did "not rise to the level of fundamental error" because the comments did "not 'reach[ ] down into the validity of the trial itself to the extent that a . . . recommendation of death could not have been obtained without the assistance of the alleged error[s].' " *Id.* (alterations in original) (quoting *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001)); *see also Braddy*, 111 So. 3d at 848 (holding that the prosecutor's reference to "the determination . . . that the State has to make in bringing a case like

- 37 -

this to [the jury] as a death penalty case," while improper, did not amount to fundamental error).

Even if improper, the prosecutor's comments do not amount to fundamental error. The cumulative effect of the prosecutor's statements here does not reach down into the validity of Cruz's trial itself to the extent that a recommendation of death could not have been obtained without the assistance of the alleged error.

Next, Cruz argues that the State made several improper comments during its penalty-phase closing argument that warrant reversal. Specifically, Cruz contends that the prosecutor made comments denigrating mitigation, misstating facts in closing argument, taking aim at frightening the jury, and creating an imaginary script for the jury.

Cruz contends that the prosecutor's comments regarding Cruz's sister, mother, and friends who testified on his behalf during the guilt phase, his suicide attempt, and his ADHD and bipolar disorder diagnoses improperly denigrated mitigation and constituted fundamental error. However, the prosecutor's comments did not denigrate mitigation, because the prosecutor

merely downplayed the significance of the mitigation and did not label the mitigation as aggravation.

"This Court has long recognized that a prosecutor cannot improperly denigrate mitigation during a closing argument." *Williamson v. State*, 994 So. 2d 1000, 1014 (Fla. 2008). "Improper denigration includes comments characterizing mitigation as 'flimsy,' 'phantom,' and 'excuses.' " *Carr v. State*, 156 So. 3d 1052, 1065 (Fla. 2015). However, this Court has explained that it is not improper for a prosecutor to "attempt[] to rebut mitigating evidence argued by the defense." *Poole v. State*, 997 So. 2d 382, 395 (Fla. 2008).

During penalty-phase closing argument, the prosecutor said the following regarding Cruz's sister:

> And there's at least one other person who grew up in exactly the same circumstances, had exactly the same risk and protective factors that we went through ad nauseum yesterday, except that she was a female, and she was one or two years older. She turned out fine. She's not calling a long list of friends to dig her out of a hole. She's not torching their mother in public to improve her circumstances.

Cruz claims that this statement by the prosecutor denigrated mitigation. Cruz relies on this Court's decision in *Walker v. State*,

707 So. 2d 300 (Fla. 1997). However, *Walker* is distinguishable because this Court addressed whether the prosecutor injected "future dangerousness" into the proceedings as a nonstatutory aggravating circumstance when the State asked an expert whether they thought the defendant might kill again. 707 So. 2d at 313-14.

In this case, the prosecutor did not denigrate the testimony of Cruz's sister. Indeed, the comments to which Cruz now objects (significantly, he did not at trial) do not characterize in any way the testimony of Cruz's sister. The prosecutor compared Cruz's life outcomes to that of his sister. We find that, in light of the entire record at the penalty phase trial, this comment does not rise to the level of fundamental error.

Cruz next challenges the following prosecutor statements: (1) "[Cruz] had ADHD and bipolar disorder. Those are not conditions that blur the line between right and wrong," and (2) "And the fact that he tried to commit suicide . . . that's not the kind of mitigation that should be important—more important or more significant than the torturous death of another human being."

"A prosecutor may request the jury to accord minimal weight to a mitigator that the defendant has proven." *Poole v. State*, 151

So. 3d 402, 416 (Fla. 2014).  Here, the State did not ask the jury to discard the mitigating evidence but downplayed the significance of the mitigating evidence.  Accordingly, no fundamental error occurred.

Next, Cruz claims that the prosecutor improperly implied a nexus requirement to the murder when referencing the injury Cruz suffered as a kid.  Specifically, Cruz challenges the statement, "He was struck by a golf club as a preteen.  That has absolutely no bearing.  None.  It's an event that occurred in his life.  Sure.  But it was never connected by any doctors to traumatic brain injury."

In *Cox v. State*, 819 So. 2d 705 (Fla. 2002), this Court analyzed whether the prosecutor improperly addressed the defendant's traumatic childhood by stating that it happened more than 25 years before the murder.  *Id.* at 718.  This Court concluded that the prosecutor's "comment was designed to convey the concept that while the mitigator may be valid, perhaps its weight should be somewhat discounted because of the passage of time and the lack of an evidentiary nexus to the defendant."  *Id.*; *see also Poole v. State*, 997 So. 2d 382, 395 n.5 (Fla. 2008) (holding that it was not improper for the prosecutor to suggest that the jury "shouldn't care

- 41 -

what [the defendant] was doing in the fourth grade" since he was 39 years old when he murdered the victim).

Similarly, in the present case, the prosecutor stated that Cruz's injury happened as a preteen, emphasizing the amount of time between the injury and the murder. Further, the prosecutor's comment that the injury has "no bearing" goes to his argument that the jury should not connect the injury to any alleged brain injury in weighing mitigation. Accordingly, these comments do not constitute fundamental error.

Cruz also argues that the prosecutor improperly appealed to the fears and prejudices of the jury in his closing argument. Specifically, Cruz challenges the following statement: "This was a brutal crime. It's the kind of crime that frightens you to your core. It's the reason that children fear the darkness. It's why people have locks on their doors and keep guns for protection."

This Court has consistently held that a prosecutor may not "impermissibly inflame[] the passions and prejudices of the jury with elements of emotion and fear." *Brooks v. State*, 762 So. 2d 879, 900 (Fla. 2000). Further, when a prosecutor gives "a dissertation on evil," effectively cautioning the jurors that they

would be cooperating with evil should they recommended life imprisonment, the prosecutor "has ventured far outside the scope of proper argument." *King v. State*, 623 So. 2d 486, 488 (Fla. 1993) (quoting *Garron v. State*, 528 So. 2d 353, 359 (Fla. 1988)). This Court has also concluded that a "message to the community" argument, "urg[ing] the jury to consider the message its verdict would send to the community at large," is "an obvious appeal to the emotions and fears of the jurors," and therefore, is improper. *Bertolotti v. State*, 476 So. 2d 130, 133 (Fla. 1985).

Here, Cruz has failed to show how the prosecutor's comments improperly inflamed the passions of the jury and amount to fundamental error. *See Braddy*, 111 So. 3d at 855-56 (concluding that the prosecutor's comments on the determination that the State has to make in bringing a death penalty case, the prosecutor's depiction of the child victim's fear using the pronoun "you," the prosecutor's questioning of the defendant's wife regarding the defendant's alleged extramarital affairs, and the prosecutor's denigration of defense counsel strategy did not cumulatively deprive the defendant of a fair trial).

Cruz contends that the prosecution improperly manufactured an imaginary script about what the victim was hearing:

> You know they talked about it. Christopher Jemery laid there bound and gagged, forced to listen to them. When they were satisfied that they had taken everything of value from his home, you know, there was a conversation about how it was going to end. That poor man had to listen to it.

Arguments that are based on facts in evidence and do not amount to an improper "golden rule" argument are not error. *See Rogers v. State*, 957 So. 2d 538, 549 (Fla. 2007). In *Rogers*, the prosecutor described the consciousness of the victim, the pain she felt while being stabbed, and her thoughts in her final twenty minutes alive. *Id.* This Court concluded that the prosecutor's arguments were based upon facts in evidence and did not place the jury in the position of the victim. *Id.*

Here, the prosecutor's comment was likewise based on facts in evidence. Cruz and Charles broke into Jemery's apartment, beat him, bound and gagged him, and ransacked his apartment. Cruz and Charles put Jemery in the trunk of his rental car, took Jemery to a remote location, and shot him. Therefore, the evidence

demonstrated that there were likely times where Jemery had to listen to discussions between Cruz and Charles.

Further, the cases cited by Cruz are unpersuasive and distinguishable. *See Garron*, 528 So. 2d at 358-59 n.6 (concluding that arguments that invited the jury to feel what the victim felt when she was shot in the chest and dragged into the bathroom were "clearly prohibited"); *Bertolotti*, 476 So. 2d at 133 (concluding that the prosecution "inviting the jury to imagine the victim's pain, terror and defenselessness" was an improper "golden rule" argument). Accordingly, we deny relief on this basis.

### 9. *Prior Felony Conviction*

Cruz argues next that the trial court erred by admitting evidence of his prior conviction of robbery with a firearm. Cruz argues that admitting this evidence violated section 90.403, Florida Statutes (2019) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."). However, because Cruz did not object to the conviction's admissibility, we review only for fundamental error.

During the penalty phase, the State presented the testimony of Deandre Perez, a former manager of Hungry Howie's in Sanford. Perez was working a shift when two individuals entered through the back door unexpectedly. One of the men, later identified as Cruz, walked up to Perez and hit him twice in the face with a gun, once above his eyebrow and once on the cheek. Perez gave them the money in the till, and they left. A surveillance video capturing the robbery was introduced into evidence during the penalty phase, along with Cruz's judgment and sentence resulting from the robbery. The trial court relied on this prior conviction exclusively in finding the prior violent felony aggravator.

Cruz claims that the introduction of this evidence was far more prejudicial than probative because it was used in proving the prior violent felony aggravating factor. However, there was no error, let alone fundamental error, in the trial court's admission of the prior conviction of robbery with a firearm.

"This Court has held that it is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction."

*Rhodes v. State*, 547 So. 2d 1201, 1204 (Fla. 1989). As this Court

has explained, "[t]estimony concerning the events which resulted in

the conviction assists the jury in evaluating the character of the

defendant and the circumstances of the crime so that the jury can

make an informed recommendation as to the appropriate sentence."

*Id.* Such testimony would also be relevant in determining what

weight to give to the prior violent felony aggravator. *See Seibert v.*

*State*, 64 So. 3d 67, 79 (Fla. 2010).

Jemery was killed on April 26, 2013, Cruz committed the

robbery at Hungry Howie's on May 6, 2013, and Cruz was arrested

on May 10, 2013. Cruz's prior conviction of robbery with a firearm

and the corresponding testimony was relevant to the prior violent

felony aggravating factor. Therefore, we deny relief on this basis.

### 10. Prior Robbery of Drug Dealer

Cruz also argues that he did not receive a fair penalty phase

because the State's expert testified that Cruz had been involved in a

prior robbery of a drug dealer. However, because Cruz did not

object to the testimony, we review only for fundamental error. *See*

*Lawrence v. State*, 614 So. 2d 1092, 1094 (Fla. 1993) (explaining

that a timely objection must be made to collateral crime evidence or any error in its admission is waived).

During the State's rebuttal at the penalty phase, the State's expert, Dr. William Riebsame, testified that Cruz told him that he committed the crime because he needed the money for drugs and that he had previously robbed a drug dealer in a similar manner.

Dr. Riebsame's testimony was relevant to this issue of motive. § 90.404(2)(a), Fla. Stat. (2019) ("Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity."). Further, even if the admission of the testimony was erroneous, for an improper statement pertaining to a collateral crime to be considered fundamental error in a capital trial, the statement must be so prejudicial as to reach down into the validity of the trial itself to the extent that a "jury recommendation of death could not have been obtained without the assistance of the alleged error." *Peterson v. State*, 94 So. 3d 514, 524 (Fla. 2012). Here, the testimony did

not go to the foundation of the case and was not a feature of the trial. Accordingly, because Cruz fails to establish fundamental error, we deny relief on this claim.

### 11. *Enmund-Tison Finding*

Cruz argues that the trial court erred in failing to instruct the jury to make an *Enmund-Tison* determination in its penalty-phase verdict. As this Court has explained:

> [T]he Supreme Court's decisions in *Enmund* and *Tison* addressed the constitutionality, in multi-participant felony murder cases, of imposing a death sentence on someone other than the person who actually killed the victim. We summarized those cases as standing for the proposition that "the death penalty may be proportional punishment if the evidence shows both that the defendant was a major participant in the crime, and that the defendant's state of mind amounted to reckless indifference to human life."

*Smiley*, 295 So. 3d at 175 (quoting *Jackson v. State*, 575 So. 2d 181, 191 (Fla. 1991)); *see also Perez v. State*, 919 So. 3d 347, 365 (Fla. 2005) ("[T]rial courts in Florida have been directed to instruct the jury 'before its penalty phase deliberations that in order to recommend a sentence of death, the jury must' 'make findings satisfying *Enmund* and . . . *Tison*' [and] 'the trial courts shall include in their sentencing orders findings supporting the

- 49 -

*Enmund/Tison* culpability requirement.' ") (citations omitted) (first

quoting *Jackson v. State*, 502 So. 2d 409, 413 (Fla. 1986), and then

quoting *Diaz v. State*, 513 So. 2d 1045, 1048 n.2 (Fla. 1987)).

During the penalty phase, Cruz did not object to the omission of

this direction to the jury, so we review it now for fundamental error.

*See State v. Delva*, 575 So. 2d 643, 644 (Fla. 1991) ("[Jury]

[i]nstructions . . . are subject to the contemporaneous objection

rule, and, absent an objection at trial, can be raised on appeal only

if fundamental error occurred.").

In its sentencing order, the trial court conducted an *Enmund-*

*Tison* analysis, finding as follows:

> The jury found Mr. Cruz to be the individual who shot and killed Jemery. In Mr. Charles' case, the State abandoned any efforts to establish Mr. Charles as the shooter. The jury in Mr. Charles' case did not have to make a determination as to who the shooter was because of the State's concession. However, the jury in Mr. Charles' case did find him guilty of both, premeditated murder AND felony murder.
> Therefore, this court finds that Mr. Cruz in fact killed Jemery and no further analysis is needed.

In this case, even without the evidence of his possession and

use of the .22-caliber firearm introduced at Charles' trial, the jury

found Cruz guilty of first-degree premeditated and felony murder,

burglary while armed, robbery with a firearm, and kidnapping. The record thus supports the finding that Cruz "was not merely an aider or abetter in a felony where a murder was committed by others." *Stephens v. State*, 787 So. 2d 747, 760 (Fla. 2001). And the record also supports the finding of "major participation in the felony committed, combined with reckless indifference to human life." *Tison*, 481 U.S. at 158; *see also Jackson v. State*, 502 So. 2d 409, 412 (Fla. 1986) ("[B]y being a major participant in the armed robbery, [the defendant], at the very least, contemplated that life would be taken."). On such a record, we cannot say that the omission of a specifically labeled *Enmund-Tison* instruction constitutes fundamental error. Accordingly, Cruz is not entitled to relief on this claim.

### 12. Sentencing Order

Cruz challenges several claims related to the sentencing order, arguing that the trial court failed in the following four ways in sentencing him to death: (a) Cruz's death penalty is disproportionate in comparison to other death sentences and Charles' life sentence; (b) the trial court improperly relied on facts not found in the record; (c) the trial court gave the aggravating

factors too much weight, or the evidence that the trial court relied on was not dispositive and purely circumstantial; and (d) the trial court failed to give the mitigating circumstances sufficient weight. We address each claim in turn. However, only one issue is dispositive, and we conclude that the trial court improperly relied on facts not in the record in sentencing Cruz to death.

## A. Proportionality

Cruz first argues that his death sentence is disproportionate in comparison with other death penalty cases. Given our recent decision in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from the judge-made requirement to review the comparative proportionality of death sentences as contrary to the conformity clause of article I, section 17 of the Florida Constitution), we need not address this claim.

We do not reach the issue of relative culpability and Cruz's argument that codefendant Charles' life sentence should also provide a life sentence for Cruz because of the need for resentencing caused by the error of reliance on facts not in evidence.

## B. Reliance on Facts Not in Evidence

Cruz also argues that the trial court improperly sentenced him to death based on facts that were not admitted during the guilt phase and facts from codefendant Charles' subsequent trial. We agree and reverse and remand for the limited purpose of resentencing by the trial court and a new sentencing order.

The judge in Cruz's case also presided over the trial of codefendant Charles. In the sentencing order, the trial court noted this fact and explained that he heard and considered evidence of the case in Cruz's and Charles' trials. Specifically, the sentencing order provides:

> Mr. Charles was tried in identical fashion—with the State seeking a death penalty against him for the same identical charge as Mr. Cruz. The Charles jury heard virtually the same case and found him guilty as charged in the indictment. However, on October 30, 2019, the jury reached a different conclusion on the sentence Mr. Charles received. Charles' sentence verdict was for life in prison without the possibility of parole for his participation in the killing of Jemery.
> In sum, this court has heard and considered the evidence of this same case in two occasions. The first instance being the jury trial of Christian Cruz. The second instance being the jury trial of Justen Charles. In both instances the jurors reached exactly the same verdicts—with the exception of a life sentence recommendation for Mr. Charles. . . .
>      . . . .

In Mr. Charles' trial, the State and the defense reached a stipulation which was not made in the Cruz trial. The stipulation was that Jemery suffered no pain after he was shot. The court finds that Mr. Cruz should benefit from the same stipulated finding and finds here that Jemery suffered no pain *after* he was shot.

. . . .

. . . [I]t is important to highlight the material difference between Mr. Cruz's trial and his co-defendant's (Mr. Charles) trial. In Mr. Cruz's trial the jury made a specific finding that Mr. Cruz's was in fact the person who pulled the trigger and shot Mr. Jemery in the head. In Mr. Charles's trial, the State adopted the theory (and Mr. Charles consented) to the fact that Mr. Charles was not the person who shot Mr. Jemery. . . .

. . . .

The court (and without objection from the defense) deferred the imposition of sentence until the time that Mr. Charles' case was tried. The trial occurred roughly six months after the verdict in Mr. Cruz's trial.

Mr. Charles' trial went exactly the same way as Mr. Cruz's with one exception. One of the jury findings in Mr. Cruz's guilt phase was a determination that Mr. Cruz was the shooter. Satisfied that Mr. Cruz had been determined to be the actual killer of Mr. Jemery, the State conceded and stipulated that Mr. Charles was not the shooter.

Despite the stipulation of the State, the jury in Mr. Charles' case found him guilty of both, Premeditated Murder *and* Felony Murder—just like Mr. Cruz. The penalty phase verdict then provided the greatest insight into the analysis of this case. In the penalty phase verdict for Mr. Charles, the jury found that:

1. All aggravators were proven beyond a reasonable doubt.
2. That the aggravators warranted a possible sentence of death.

3. That at least one or more mitigating circumstances had been established.
4. That the aggravators outweighed the mitigating circumstances.
5. That Mr. Charles should be sentenced to life.

With the exception of their finding of a life sentence for Mr. Charles, Mr. Cruz's verdict was identical. That means that two separate juries of twelve people heard the same case and reached almost the same exact conclusion in their verdicts.

This court is convinced that the only thing that made a difference in Mr. Charles' case and spared him the death sentence was the fact that the State stipulated that he was not the shooter in this case.

In its sentencing order, the trial court also relied on facts not in evidence in Cruz's guilt phase:

Justen Charles' girlfriend testified that while at her apartment the defendant displayed a firearm. The firearm was a .22 caliber handgun. Mr. Charles' girlfriend testified that she wanted Mr. Charles to remain with her but that Mr. Charles and the defendant left the apartment claiming that they would come back.

. . . .

. . . She also testified that Mr. Charles carried a 9mm handgun with him as well.

. . . .

. . . The court rejects the testimony of jail house witnesses who testified in Mr. Charles' trial and said that:

Mr. Charles told Mr. Cruz not to kill Mr. Jemery—to let him go. But Mr. Cruz replied that "he had to be killed because he could identify them."

It is improper for a trial court to consider "evidence from a different trial that was not introduced in the guilt phase of the present trial." *Davis v. State*, 207 So. 3d 177, 192 (Fla. 2016) (quoting *Dailey v. State*, 594 So. 2d 254, 259 (Fla. 1991)).

In sentencing Cruz to death, the trial court relied on evidence from Charles' trial, specifically the testimony of Charles' girlfriend regarding seeing Cruz with a .22 caliber firearm, as well as the stipulation in Charles' trial that Cruz was the shooter. However, there is no competent, substantial evidence presented in Cruz's trial to support the jury's finding that Cruz was the shooter. We cannot determine what weight the trial judge gave to the finding that Cruz was the shooter or what part the nonrecord evidence from codefendant Charles' trial played in Cruz's sentence. Here, this was error that cannot be considered harmless.

Accordingly, although we affirm Cruz's convictions, we vacate his death sentence and remand for resentencing by the trial court and a new sentencing order. We direct the trial court to reevaluate and resentence Cruz based solely on the record evidence presented in Cruz's trial, not codefendant Charles' trial. A new penalty phase is not necessary.

### C. Aggravating Factors

Cruz makes a series of claims related to the trial court's findings on the aggravating factors in the sentencing order. Specifically, Cruz challenges the weight assigned to the prior violent felony and commission of a felony aggravating factors. Cruz also contends there is insufficient evidence to support the financial gain, HAC, avoid arrest, and CCP aggravating factors.

This Court has explained:

> "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.'" Rather, it is this Court's task on appeal "to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding."

*Martin v. State*, 151 So. 3d 1184, 1192-93 (Fla. 2014) (citation omitted) (quoting *Williams v. State*, 37 So. 3d 187, 195 (Fla. 2010)).

#### i. Prior Violent Felony

First, Cruz challenges the weight the trial court assigned to the prior violent felony aggravator because the violent felony occurred after Jemery was killed. However, Cruz fails to identify any authority in support of this claim. "The weight to be accorded

an aggravator is within the discretion of the trial court and will be affirmed if based on competent, substantial evidence." *Frances v. State*, 970 So. 2d 806, 816 (Fla. 2007).

The trial court found this aggravator proven beyond a reasonable doubt and assigned "great weight" to the aggravator. The trial court relied on the evidence of the robbery Cruz and Charles committed at a Hungry Howie's in Sanford, Florida, as well as the certified judgment and sentence of the conviction resulting from the robbery. The trial court also relied on the video surveillance footage of the robbery, finding as follows:

> The video graphically demonstrated the brazen and violent nature of the defendant's conduct. He seems awfully comfortable in committing the crime. His treatment of the victims in the video is shocking and appalling, demonstrating a total disregard for human decency. The defendant's unabashed and bold attitude is visually clear. While it is fair to say that all robberies are crimes of violence, the severity of this particular crime separates it from most in that the treatment of the victims created sheer terror during the crime. There's no doubt in the court's mind that all who saw the video agonized with the thought of not knowing whether someone was about to be killed during the robbery.

Competent, substantial evidence supports the trial court's finding of the prior violent felony aggravator. Evidence presented during the penalty phase included the testimony of Deandre Perez,

as well as the certified judgment and sentence of the conviction resulting from the robbery and video surveillance footage of the robbery. The prior violent felony is one of "the weightiest aggravators in Florida's statutory scheme." *Gonzalez v. State*, 136 So. 3d 1125, 1167 (Fla. 2014). Further, Cruz's argument challenging the weight the trial court assigned to the prior violent felony aggravator because the violent felony occurred after Jemery was killed is without merit. *See Elledge v. State*, 346 So. 2d 998, 1001 (Fla. 1977) (establishing that the prior violent felony aggravator applies even when the aggravating offense was committed after the charged murder). We deny Cruz's claim for relief.

### ii. Commission of a Felony

Cruz also argues that the trial court erred in assigning great weight to the fact that the first-degree murder was committed in the course of the robbery, burglary, or kidnapping. Specifically, Cruz alleges that the trial judge should not have assigned great weight because the State did not present adequate evidence proving that Cruz was the driving force behind the contemporaneous burglary, robbery, or kidnapping. This Court reviews a trial court's

assignment of weight to aggravators for abuse of discretion. *See*

*Gilliam v. State*, 582 So. 2d 610, 611-12 (Fla. 1991).

In evaluating the evidence of the burglary, robbery, and

kidnapping, the trial court stated,

> The State presented strong circumstantial evidence of
> how the killing came about and the events that preceded
> the killing. The purpose for the crime was proven by
> showing that Mr. Walters was a drug dealer and resided
> in the same apartment as Mr. Jemery shortly before the
> robbery. Mr. Charles personally knew Mr. Walters and
> had purchased and/or used drugs there before.
> . . . .
> The evidence showed that the commission of the
> burglary and robbery took a fair amount of time. The
> defendant and the codefendant had to spend time in
> both, ransacking the apartment, and forcing Mr. Jemery
> to provide them with information, money, or controlled
> substances he simply did not have. That is when Mr.
> Jemery was kidnapped and placed in the trunk of his
> own vehicle.
> Proof of blood in the trunk of the vehicle was
> circumstantial evidence that after his apartment was
> invaded, burglarized and he was robbed, the defendants
> placed Mr. Jemery in the trunk of the vehicle and
> kidnapped him and transported him to the place of the
> shooting. The fact that Mr. Jemery was found miles from
> his apartment in an open field in Seminole County
> further establishes the kidnapping. The burglary,
> robbery and kidnapping ended when Mr. Cruz shot Mr.
> Jemery in the head for the express purpose of killing
> him.

Competent, substantial evidence supports the trial court's

finding of the murder committed in the course of a felony

aggravator. The evidence presented established that Cruz and Charles broke into Jemery's apartment, beat him, and robbed him. Cruz and Charles also stole a television and a prescription bottle from the apartment, and Cruz was seen removing money from Jemery's account at an ATM. Further, blood found in the trunk of Jemery's car demonstrated that Jemery was placed in the trunk and driven to the field where he was shot and found miles from his home. Accordingly, because the trial court did not abuse its discretion, we deny relief on this claim.

### iii. Financial Gain[7]

Next, Cruz challenges the trial court's finding that the murder was committed for financial gain because the evidence was circumstantial. This aggravator is applicable in capital cases where the murder was "motivated, at least in part, by a desire to obtain money, property, or other financial gain." *Durousseau v. State*, 55

---

7. In the sentencing order, the trial court merged pecuniary gain and murder in the course of a felony as a single merged aggravator. However, because the trial court analyzed these two aggravators separately, and Cruz challenged the findings separately, we analyze them separately.

So. 3d 543, 558 (Fla. 2010) (quoting *Finney v. State*, 660 So. 2d 674, 680 (Fla. 1995)).

In assigning great weight to this aggravator, the trial court stated the following:

> The indictment in this case alleged that the robbery committed by the defendant deprived the victim of "a television and/or a container of medication or narcotics and/or U.S. currency of some value . . . ." At trial, the evidence shows that the defendant's purpose in coming to Mr. Jemery's apartment was to rob Mr. Walters and obtain something of value. Upon failing to find Mr. Walters, they did not abandon their efforts but instead took it upon themselves to forcefully compel and extricate from Mr. Jemery something of value for their crime. Although it was proven at trial that in fact the defendant and the codefendant stole items from Mr. Jemery's apartment, the most compelling piece of evidence is the ATM's photograph of Mr. Cruz withdrawing money from Mr. Jemery's account shortly after the kidnapping. It is unfathomable to think that Mr. Jemery would have willingly given his debit card and PIN number to Mr. Cruz, except under the most compelling of circumstances. The burglary, robbery and kidnapping would have left Mr. Jemery with no option but to give everything he had in order to save his life.

Competent, substantial evidence supports the trial court's finding as to the financial gain aggravator. Evidence presented at trial established that a television was removed from the apartment, along with a prescription bottle of pills. Further, ATM surveillance video footage showed Cruz using Jemery's debit card on the night

he was killed. *See Huggins v. State*, 889 So. 2d 743, 770 (Fla. 2004) (concluding there was competent, substantial evidence to support a trial court's finding of the pecuniary gain aggravator when the defendant stole the victim's car and jewelry). Accordingly, we deny relief on this claim.

*iv. HAC*

Cruz also argues that there is insufficient evidence to support the HAC aggravator. In applying this aggravator, the trial court found:

> The constellation of injuries suffered by Mr. Jemery during the robbery and kidnapping can be separated into two events. The court is reasonably certain that the beating of his body, whether by hand or other objects occurred while Mr. Jemery was within his own home. It is unknown whether Mr. Jemery resisted to any degree, or whether the assault upon his body was gratuitous violence, but under either scenario the analysis here is not altered.
>
> . . . .
>
> Again, it is reasonable to conclude that Mr. Jemery suffered anguish and fear during the burglary, robbery, and especially after he was kidnapped. There's no doubt that Mr. Jemery was alive and conscious when the robbery was taking place. Furthermore, he must have been alive and conscious when he was gagged and bound and kidnapped from the home. Sheer terror must have filled his mind knowing that he had been taken to a strange location—in what only can be described as the killing field. No mercy was shown to Mr. Jemery.

The HAC aggravator applies to murders that are both "conscienceless or pitiless and unnecessarily torturous to the victim." *Francis v. State*, 808 So. 2d 110, 134 (Fla. 2001). The focus is "on the *means and manner* in which death is inflicted and the immediate circumstances surrounding the death." *Buzia v. State*, 926 So. 2d 1203, 1211-12 (Fla. 2006) (quoting *Barnhill v. State*, 834 So. 2d 836, 850 (Fla. 2002)). Gunshot murders can qualify as HAC if the events preceding the death "cause the victim fear, emotional strain, and terror." *Marquardt v. State*, 156 So. 3d 464, 488 (Fla. 2015). To support HAC, "the evidence must show that the victim was conscious and aware of impending death." *King v. State*, 130 So. 3d 676, 684 (Fla. 2013) (quoting *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004)). "However, the victim's perception of imminent death need only last seconds for this aggravator to apply." *Gonzales v. State*, 136 So. 3d 1125, 1162 (Fla. 2014).

Competent, substantial evidence supports the trial court's finding of the HAC aggravator. Jemery's blood was found throughout his apartment, indicating that he sustained a beating before being shot. Jemery sustained numerous injuries to his

head, face, hands and torso, including cuts, bruises, and lacerations. Further, Jemery was taken from his home and placed in the trunk of his rental car, as evidenced by his blood found in the trunk. Jemery was shot in the head and found alive in a field, and his arms and mouth were bound with wire and duct tape. *See Patrick v. State*, 104 So. 3d 1046, 1066-67 (Fla. 2012) (upholding a finding of the HAC aggravator when the victim was beaten during the commission of the murder and the sentence of death was imposed). Accordingly, we deny relief on this claim.

### v. Avoid Arrest

Next, Cruz argues that there is insufficient evidence to support the avoid arrest aggravator. "The avoid arrest aggravating circumstance, which is also referred to as witness elimination, applies when the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or to effectuate an escape from custody." *Wright v. State,* 19 So. 3d 277, 301 (Fla. 2009). "Where the victim is not a law enforcement officer, the evidence must demonstrate beyond a reasonable doubt that 'the sole or dominant motive for the murder was the elimination of the

witness.'" *Id.* (quoting *Preston v. State*, 607 So. 2d 404, 409 (Fla. 1992)).

"Even without direct evidence of the offender's thought processes, the arrest avoidance factor can be supported by circumstantial evidence through inference from the facts shown." *Swafford v. State*, 533 So. 2d 270, 276 n.6 (Fla. 1988). Such circumstantial evidence includes "whether the victim knew and could identify the killer." *Hernandez v. State*, 4 So. 3d 642, 667 (Fla. 2009). Other factors include "whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant." *Farina*, 801 So. 2d at 54.

Competent, substantial evidence supports the trial court's finding that Cruz killed Jemery in order to avoid arrest. First, although Jemery did not personally know Cruz or Charles, Jemery had friends who knew Cruz and Charles and would be able to identify them. Jemery also resisted the attack by Cruz and Charles, as evidenced by the defensive wounds to Jemery's right arm. Being bound, gagged, and placed in the trunk of his car before being

driven to a remote location to be killed also supports the conclusion that Cruz killed Jemery with the purpose of eliminating him as a witness and to avoid potential arrest. *See Hoskins v. State*, 965 So. 2d 1, 19-20 (Fla. 2007) (concluding that the victim's ability to identify the defendant, the defendant's ability to leave with little resistance due to the victim being bound and gagged, and the defendant's act of taking the victim to a remote area to kill the victim all support the conclusion that the killing was to eliminate the sole witness to the crimes). Accordingly, we deny relief on this claim.

### vi. CCP

Finally, Cruz argues that the trial court erred in finding that the CCP aggravator was proven beyond a reasonable doubt. To prove the CCP aggravator, the court must find that

> the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.

*Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007).

- 67 -

The CCP aggravator may be proven by demonstrating such facts as (1) "advance procurement of a weapon," (2) "lack of resistance or provocation," (3) "the appearance of a killing carried out as a matter of course," *id.* at 98 (quoting *Swafford*, 533 So. 2d at 277), and (4) "[t]aking a victim to an isolated location or choosing an isolated location to carry out an attack." *Id.* at 99.

Here, competent, substantial evidence supports the trial court's finding of the CCP aggravator. Jemery was bound by duct tape, meaning he could no longer resist the attacks by Cruz and Charles. Also, Cruz and Charles took their time in carrying out their crimes: they initially broke into his apartment; they beat Jemery as evidenced by his blood in the apartment; they bound and gagged him with duct tape and wire; they ransacked the apartment; and finally, they drove to a remote location in an industrial area and shot Jemery. Evidence at trial also established that Cruz and Charles were inquiring about the former resident of Jemery's apartment, the apartment, and drugs in the apartment shortly before Jemery was killed. Accordingly, we deny relief.

### D. Mitigating Circumstances

Last, Cruz argues that the trial judge did not give sufficient weight to multiple mitigating circumstances. "This Court reviews a trial court's assignment of weight to mitigation under an abuse of discretion standard," *Bevel v. State*, 983 So. 2d 505, 521 (Fla. 2008), and "will not disturb the sentencing judge's determination as to the 'relative weight to give each established mitigator' where that ruling is 'supported by competent substantial evidence,' " *Gill v. State*, 14 So. 3d 946, 964 (Fla. 2009) (quoting *Blackwood v. State*, 777 So. 2d 399, 412-13 (Fla. 2000)).

First, Cruz argues that the trial court referred to Cruz's refusal to accept a plea prior to trial, which amounted to consideration of a nonstatutory aggravator. However, this argument is without merit. In the sentencing order, the trial court specifically listed the aggravators that it considered and assigned weight to each of them, and this was not one of them. The trial court began the introduction of mitigation by discussing some procedural history of the case. There is no other indication in the sentencing order that Cruz's refusal to accept a plea prior to trial was considered as a nonstatutory aggravator in the sentencing.

Cruz further argues that the trial court improperly gave many of the mitigating circumstances slight weight. However, this challenge constitutes nothing more than a disagreement as to the weight assigned to varying mitigating circumstances. This is not a basis for relief. *See Fletcher v. State*, 168 So. 3d 186, 218 (Fla. 2015) ("Simple disagreement with the weight given by the trial court is not a basis for relief, so we deny these claims."). Here, the trial court found all 37 mitigating circumstances as proven and assigned weight to every mitigating circumstance.[8] Because the trial court did not abuse its discretion, we deny relief.

### 13. *Constitutionality of Florida's Death Penalty*

Cruz next asserts that Florida's capital sentencing scheme is unconstitutional for the following reasons: (1) there are so many aggravators that almost every murder is death eligible; (2) the indictment failed to allege any aggravating factors; (3) the jury was not given proper guidance on determining the existence of the

---

8. We also reject Cruz's argument that the trial court improperly required a nexus between the crime and the mitigating evidence. *See Fletcher*, 168 So. 3d at 219 ("Although a trial court cannot require a nexus between the crime and mitigating evidence, the court may place mitigating evidence in context.").

sentencing factors or how to weigh them; (4) the aggravating circumstance of murder in the commission of a felony amounts to an automatic aggravating factor in felony murder cases creating a presumption for a death sentence; (5) the jury was permitted to consider victim impact evidence, which is not relevant as an aggravating factor; (6) the prior violent felony aggravating factor is improperly vague and overbroad, as it does not require the "prior" conviction used to be final and allows contemporaneous convictions and even offenses occurring after the charged homicide to be used, thus impermissibly expanding the word "prior" beyond clear legislative language; and (7) the HAC factor is vague and overbroad.

However, Cruz's arguments are ones that this Court has repeatedly rejected. *See Lugo v. State*, 845 So. 2d 74, 119 (Fla. 2003) (rejecting as meritless the argument that Florida's capital sentencing scheme "fails to limit the class of persons eligible for the death penalty"); *Miller v. State*, 42 So. 3d 204, 215 (Fla. 2010) (rejecting as meritless the argument that "an indictment must allege the required factual findings in support of a death sentence" because "Florida's capital sentencing scheme withstands constitutional scrutiny because it provides sufficient notice of the

charges against the accused"); *Reynolds v. State*, 251 So. 3d 811, 823-28 (Fla. 2018) (rejecting argument that Standard Jury Instruction 7.11 did not give the jury proper guidance); *Bush v. State*, 295 So. 3d 179, 213-14 (Fla. 2020) ("The trial court instructed the jury with the standard jury instruction on victim impact testimony, including the instruction that victim impact testimony was not to be used for finding aggravation and was not to be considered as an aggravating factor."); *Blanco v. State*, 706 So. 2d 7, 11 (Fla. 1997) (rejecting the argument that the murder in the commission of a felony aggravator amounts to an automatic aggravating factor creating a presumption for a death sentence because "[t]he list of enumerated felonies in the provision defining felony murder is larger than the list of enumerated felonies in the provision defining the aggravating circumstance of commission during the course of an enumerated felony"); *Bonifay v. State*, 680 So. 2d 413, 420 (Fla. 1996) ("Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family. Therefore, we find this testimony relevant."); *Knight v. State*, 923 So. 2d 387,

411 (Fla. 2005) (rejecting claims that the prior violent felony aggravating factor is unconstitutionally vague and overbroad); *Gilliam*, 582 So. 2d at 612 (rejecting as meritless the argument that the jury instruction on HAC is unconstitutionally vague). We decline to revisit these precedents here.

### 14. *Cumulative Effect of Penalty-Phase Errors*

Cruz argues that the cumulative effect of the errors in the penalty phase of his trial deprived him of due process and a reliable sentencing. As discussed in the analysis of the individual issues above, because there were no individual errors in the jury portion of the penalty phase, we conclude that there was no cumulative error pertaining to the jury portion of the penalty phase. *See Fletcher*, 168 So. 3d at 216. Therefore, a new penalty phase is not required. However, because we conclude that the trial court improperly relied on facts not in the record in sentencing Cruz to death and are remanding for a new sentencing by the trial court and a new sentencing order, we do not address the cumulative error pertaining to the judge portion of the penalty phase.

### 15. Sufficiency of the Evidence

"In appeals where the death penalty has been imposed," regardless of whether the defendant raises the sufficiency of the evidence as an issue on appeal, this Court "independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." *Davis v. State*, 2 So. 3d 952, 966-67 (Fla. 2008); *see also* Fla. R. App. P. 9.142(a)(5).

Cruz was convicted of both first-degree premeditated and felony murder, and the convictions can be upheld on appeal if the evidence is sufficient to support either theory. Cruz's fingerprint was found on a piece of duct tape recovered from Jemery's body. Cruz's DNA was found on a swab of blood taken from the front right kick panel and the right front door of Jemery's car. Cruz's fingerprint was also found on the Air Jordan shoe box found at Jemery's apartment and on Jemery's cell phone, which was recovered from Jemery's car. Footprints made in blood matching the shoes of Cruz were found inside the apartment. Further, ATM surveillance video footage showed Cruz using Jemery's debit card on the night he was killed. With regard to premeditation, the State presented evidence establishing that the day before the murder,

Cruz and Charles were together in the vicinity of Jemery's apartment and asked about the apartment and drugs. Competent, substantial evidence supports Cruz's first-degree murder convictions.

## CONCLUSION

We affirm Cruz's convictions but reverse and remand for the limited purpose of requiring the trial court to perform a new sentencing evaluation and provide a new sentencing order.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Volusia County,
    Raul A. Zambrano, Judge – 642013CF102943XXXADL

J. Rafael Rodriguez of Law Offices of J. Rafael Rodriguez, Miami, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Patrick Bobek, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee